80 U.S. 397 (____)
13 Wall. 397
TARBLE'S CASE.
Supreme Court of United States.

*401 Mr. B.H. Bristow, Solicitor-General, contra, and for the United States.
Mr. Justice FIELD, after stating the case, delivered the opinion of the court, as follows:
The important question is presented by this case, whether *402 a State court commissioner has jurisdiction, upon habeas corpus, to inquire into the validity of the enlistment of soldiers into the military service of the United States, and to discharge them from such service when, in his judgment, their enlistment has not been made in conformity with the laws of the United States. The question presented may be more generally stated thus: Whether any judicial officer of a State has jurisdiction to issue a writ of habeas corpus, or to continue proceedings under the writ when issued, for the discharge of a person held under the authority, or claim and color of the authority, of the United States, by an officer of that government. For it is evident, if such jurisdiction may be exercised by any judicial officer of a State, it may be exercised by the court commissioner within the county for which he is appointed; and if it may be exercised with reference to soldiers detained in the military service of the United States, whose enlistment is alleged to have been illegally made, it may be exercised with reference to persons employed in any other department of the public service when their illegal detention is asserted. It may be exercised in all cases where parties are held under the authority of the United States, whenever the invalidity of the exercise of that authority is affirmed. The jurisdiction, if it exist at all, can only be limited in its application by the legislative power of the State. It may even reach to parties imprisoned under sentence of the National courts, after regular indictment, trial, and conviction, for offences against the laws of the United States. As we read the opinion of the Supreme Court of Wisconsin in this case, this is the claim of authority asserted by that tribunal for itself and for the judicial officers of that State. It does, indeed, disclaim any right of either to interfere with parties in custody, under judicial sentence, when the National court pronouncing sentence had jurisdiction to try and punish the offenders, but it asserts, at the same time, for itself and for each of those officers, the right to determine, upon habeas corpus, in all cases, whether that court ever had such jurisdiction. In the case of Booth, which subsequently came before this court, *403 it not only sustained the action of one of its justices in discharging a prisoner held in custody by a marshal of the United States, under a warrant of commitment for an offence against the laws of the United States, issued by a commissioner of the United States; but it discharged the same prisoner when subsequently confined under sentence of the District Court of the United States for the same offence, after indictment, trial, and conviction, on the ground that, in its judgment, the act of Congress creating the offence was unconstitutional; and in order that its decision in that respect should be final and conclusive, directed its clerk to refuse obedience to the writ of error issued by this court, under the act of Congress, to bring up the decision for review.
It is evident, as said by this court when the case of Booth was finally brought before it, if the power asserted by that State court existed, no offence against the laws of the United States could be punished by their own tribunals, without the permission and according to the judgment of the courts of the State in which the parties happen to be imprisoned; that if that power existed in that State court, it belonged equally to every other State court in the Union where a prisoner was within its territorial limits; and, as the different State courts could not always agree, it would often happen that an act, which was admitted to be an offence and justly punishable in one State, would be regarded as innocent, and even praiseworthy in another, and no one could suppose that a government, which had hitherto lasted for seventy years, "enforcing its laws by its own tribunals, and preserving the union of the States, could have lasted a single year, or fulfilled the trusts committed to it, if offences against its laws could not have been punished without the consent of the State in which the culprit was found."
The decision of this court in the two cases which grew out of the arrest of Booth, that of Ableman v. Booth, and that of The United States v. Booth,[*] disposes alike of the claim of *404 jurisdiction by a State court, or by a State judge, to interfere with the authority of the United States, whether that authority be exercised by a Federal officer or be exercised by a Federal tribunal. In the first of these cases Booth had been arrested and committed to the custody of a marshal of the United States by a commissioner appointed by the District Court of the United States, upon a charge of having aided and abetted the escape of a fugitive slave. Whilst thus in custody a justice of the Supreme Court of Wisconsin issued a writ of habeas corpus directed to the marshal, requiring him to produce the body of Booth with the cause of his imprisonment. The marshal made a return, stating that he held the prisoner upon the warrant of the commissioner, a copy of which he annexed to and returned with the writ. To this return Booth demurred as insufficient in law to justify his detention, and, upon the hearing which followed, the justice held his detention illegal, and ordered his discharge. The marshal thereupon applied for and obtained a certiorari, and had the proceedings removed to the Supreme Court of the State, where, after argument, the order of the justice discharging the prisoner from custody was affirmed. The decision proceeded upon the ground that the act of Congress respecting fugitive slaves was unconstitutional and void.
In the second case, Booth had been indicted for the offence with which he was charged before the commissioner, and from which the State judge had discharged him, and had been tried and convicted in the District Court of the United States for the District of Wisconsin, and been sentenced to pay a fine of $1000, and to be imprisoned for one month. Whilst in imprisonment, in execution of this sentence, application was made by Booth to the Supreme Court of the State, for a writ of habeas corpus, alleging in his application that his imprisonment was illegal, by reason of the unconstitutionality of the fugitive slave law, and that the District Court had no jurisdiction to try or punish him for the matter charged against him. The court granted the application, and issued the writ, to which the sheriff, to whom the prisoner had been committed by the marshal, returned that he *405 held the prisoner by virtue of the proceedings and sentence of the District Court, a copy of which was annexed to his return. Upon demurrer to this return, the court adjudged the imprisonment of Booth to be illegal, and ordered him to be discharged from custody, and he was accordingly set at liberty.
For a review in this court of the judgments in both of these cases, writs of error were prosecuted. No return, however, was made to the writs, the clerk of the Supreme Court of Wisconsin having been directed by that court to refuse obedience to them; but copies of the records were filed by the Attorney-General, and it was ordered by this court that they should be received with the same effect and legal operation as if returned by the clerk. The cases were afterwards heard and considered together, and the decision of both was announced in the same opinion. In that opinion the Chief Justice details the facts of the two cases at length, and comments upon the character of the jurisdiction asserted by the State judge and the State court; by the State judge to supervise and annul the proceedings of a commissioner of the United States, and to discharge a prisoner committed by him for an offence against the laws of the United States; and by the State court to supervise and annul the proceedings and judgment of a District Court of the United States, and to discharge a prisoner who had been indicted, tried, and found guilty of an offence against the laws of the United States and sentenced to imprisonment by that court.
And in answer to this assumption of judicial power by the judges and by the Supreme Court of Wisconsin thus made, the Chief Justice said as follows: If they "possess the jurisdiction they claim, they must derive it either from the United States or the State. It certainly has not been conferred on them by the United States; and it is equally clear it was not in the power of the State to confer it, even if it had attempted to do so; for no State can authorize one of its judges or courts to exercise judicial power, by habeas corpus or otherwise, within the jurisdiction of another and independent government. And although the State of Wisconsin *406 is sovereign within its territorial limits to a certain extent, yet that sovereignty is limited and restricted by the Constitution of the United States. And the powers of the General government and of the State, although both exist and are exercised within the same territorial limits, are yet separate and distinct sovereignties, acting separately and independently of each other, within their respective spheres. And the sphere of action appropriated to the United States, is as far beyond the reach of the judicial process issued by a State judge or a State court, as if the line of division was traced by landmarks and monuments visible to the eye. And the State of Wisconsin had no more power to authorize these proceedings of its judges and courts, than it would have had if the prisoner had been confined in Michigan, or in any other State of the Union, for an offence against the laws of the State in which he was imprisoned."
It is in the consideration of this distinct and independent character of the government of the United States, from that of the government of the several States, that the solution of the question presented in this case, and in similar cases, must be found. There are within the territorial limits of each State two governments, restricted in their spheres of action, but independent of each other, and supreme within their respective spheres. Each has its separate departments; each has its distinct laws, and each has its own tribunals for their enforcement. Neither government can intrude within the jurisdiction, or authorize any interference therein by its judicial officers with the action of the other. The two governments in each State stand in their respective spheres of action in the same independent relation to each other, except in one particular, that they would if their authority embraced distinct territories. That particular consists in the supremacy of the authority of the United States when any conflict arises between the two governments. The Constitution and the laws passed in pursuance of it, are declared by the Constitution itself to be the supreme law of the land, and the judges of every State are bound thereby, "anything in the constitution or laws of any State to the contrary notwithstanding." *407 Whenever, therefore, any conflict arises between the enactments of the two sovereignties, or in the enforcement of their asserted authorities, those of the National government must have supremacy until the validity of the different enactments and authorities can be finally determined by the tribunals of the United States. This temporary supremacy until judicial decision by the National tribunals, and the ultimate determination of the conflict by such decision, are essential to the preservation of order and peace, and the avoidance of forcible collision between the two governments. "The Constitution," as said by Mr. Chief Justice Taney, "was not framed merely to guard the States against danger from abroad, but chiefly to secure union and harmony at home; and to accomplish this end it was deemed necessary, when the Constitution was framed, that many of the rights of sovereignty which the States then possessed should be ceded to the General government; and that in the sphere of action assigned to it, it should be supreme and strong enough to execute its own laws by its own tribunals, without interruption from a State, or from State authorities." And the judicial power conferred extends to all cases arising under the Constitution, and thus embraces every legislative act of Congress, whether passed in pursuance of it, or in disregard of its provisions. The Constitution is under the view of the tribunals of the United States when any act of Congress is brought before them for consideration.
Such being the distinct and independent character of the two governments, within their respective spheres of action, it follows that neither can intrude with its judicial process into the domain of the other, except so far as such intrusion may be necessary on the part of the National government to preserve its rightful supremacy in cases of conflict of authority. In their laws, and mode of enforcement, neither is responsible to the other. How their respective laws shall be enacted; how they shall be carried into execution; and in what tribunals, or by what officers; and how much discretion, or whether any at all shall be vested in their officers, *408 are matters subject to their own control, and in the regulation of which neither can interfere with the other.
Now, among the powers assigned to the National government, is the power "to raise and support armies," and the power "to provide for the government and regulation of the land and naval forces." The execution of these powers falls within the line of its duties; and its control over the subject is plenary and exclusive. It can determine, without question from any State authority, how the armies shall be raised, whether by voluntary enlistment or forced draft, the age at which the soldier shall be received, and the period for which he shall be taken, the compensation he shall be allowed, and the service to which he shall be assigned. And it can provide the rules for the government and regulation of the forces after they are raised, define what shall constitute military offences, and prescribe their punishment. No interference with the execution of this power of the National government in the formation, organization, and government of its armies by any State officials could be permitted without greatly impairing the efficiency, if it did not utterly destroy, this branch of the public service. Probably in every county and city in the several States there are one or more officers authorized by law to issue writs of habeas corpus on behalf of persons alleged to be illegally restrained of their liberty; and if soldiers could be taken from the army of the United States, and the validity of their enlistment inquired into by any one of these officers, such proceeding could be taken by all of them, and no movement could be made by the National troops without their commanders being subjected to constant annoyance and embarrassment from this source. The experience of the late rebellion has shown us that, in times of great popular excitement, there may be found in every State large numbers ready and anxious to embarrass the operations of the government, and easily persuaded to believe every step taken for the enforcement of its authority illegal and void. Power to issue writs of habeas corpus for the discharge of soldiers in the military service, in the hands of parties thus disposed, might be used, and often would be *409 used, to the great detriment of the public service. In many exigencies the measures of the National government might in this way be entirely bereft of their efficacy and value. An appeal in such cases to this court, to correct the erroneous action of these officers, would afford no adequate remedy. Proceedings on habeas corpus are summary, and the delay incident to bringing the decision of a State officer, through the highest tribunal of the State, to this court for review, would necessarily occupy years, and in the meantime, where the soldier was discharged, the mischief would be accomplished. It is manifest that the powers of the National government could not be exercised with energy and efficiency at all times, if its acts could be interfered with and controlled for any period by officers or tribunals of another sovereignty.
It is true similar embarrassment might sometimes be occasioned, though in a less degree, by the exercise of the authority to issue the writ possessed by judicial officers of the United States, but the ability to provide a speedy remedy for any inconvenience following from this source would always exist with the National legislature.
State judges and State courts, authorized by laws of their States to issue writs of habeas corpus, have undoubtedly a right to issue the writ in any case where a party is alleged to be illegally confined within their limits, unless it appear upon his application that he is confined under the authority, or claim and color of the authority, of the United States, by an officer of that government. If such fact appear upon the application the writ should be refused. If it do not appear, the judge or court issuing the writ has a right to inquire into the cause of imprisonment, and ascertain by what authority the person is held within the limits of the State; and it is the duty of the marshal, or other officer having the custody of the prisoner, to give, by a proper return, information in this respect. His return should be sufficient, in its detail of facts, to show distinctly that the imprisonment is under the authority, or claim and color of the authority, of the United States, and to exclude the suspicion of imposition *410 or oppression on his part. And the process or orders, under which the prisoner is held, should be produced with the return and submitted to inspection, in order that the court or judge issuing the writ may see that the prisoner is held by the officer, in good faith, under the authority, or claim and color of the authority, of the United States, and not under the mere pretence of having such authority.
This right to inquire by process of habeas corpus, and the duty of the officer to make a return, "grows necessarily," says Mr. Chief Justice Taney, "out of the complex character of our government and the existence of two distinct and separate sovereignties within the same territorial space, each of them restricted in its power, and each within its sphere of action, prescribed by the Constitution of the United States, independent of the other. But, after the return is made, and the State judge or court judicially apprised that the party is in custody under the authority of the United States, they can proceed no further. They then know that the prisoner is within the dominion and jurisdiction of another government, and that neither the writ of habeas corpus nor any other process issued under State authority can pass over the line of division between the two sovereignties. He is then within the dominion and exclusive jurisdiction of the United States. If he has committed an offence against their laws, their tribunals alone can punish him. If he is wrongfully imprisoned, their judicial tribunals can release him and afford him redress."
Some attempt has been made in adjudications, to which our attention has been called, to limit the decision of this court in Ableman v. Booth, and The United States v. Booth, to cases where a prisoner is held in custody under undisputed lawful authority of the United States, as distinguished from his imprisonment under claim and color of such authority. But it is evident that the decision does not admit of any such limitation. It would have been unnecessary to enforce, by any extended reasoning, such as the Chief Justice uses, the position that when it appeared to the judge or officer issuing the writ, that the prisoner was held under undisputed *411 lawful authority, he should proceed no further. No Federal judge even could, in such case, release the party from imprisonment, except upon bail when that was allowable. The detention being by admitted lawful authority, no judge could set the prisoner at liberty, except in that way, at any stage of the proceeding. All that is meant by the language used is, that the State judge or State court should proceed no further when it appears, from the application of the party, or the return made, that the prisoner is held by an officer of the United States under what, in truth, purports to be the authority of the United States; that is, an authority, the validity of which is to be determined by the Constitution and laws of the United States. If a party thus held be illegally imprisoned it is for the courts or judicial officers of the United States, and those courts or officers alone, to grant him release.
This limitation upon the power of State tribunals and State officers furnishes no just ground to apprehend that the liberty of the citizen will thereby be endangered. The United States are as much interested in protecting the citizen from illegal restraint under their authority, as the several States are to protect him from the like restraint under their authority, and are no more likely to tolerate any oppression. Their courts and judicial officers are clothed with the power to issue the writ of habeas corpus in all cases, where a party is illegally restrained of his liberty by an officer of the United States, whether such illegality consist in the character of the process, the authority of the officer, or the invalidity of the law under which he is held. And there is no just reason to believe that they will exhibit any hesitation to exert their power, when it is properly invoked. Certainly there can be no ground for supposing that their action will be less prompt and efficient in such cases than would be that of State tribunals and State officers.[*]
It follows, from the views we have expressed, that the court commissioner of Dane County was without jurisdiction *412 to issue the writ of habeas corpus for the discharge of the prisoner in this case, it appearing, upon the application presented to him for the writ, that the prisoner was held by an officer of the United States, under claim and color of the authority of the United States, as an enlisted soldier mustered into the military service of the National government; and the same information was imparted to the commissioner by the return of the officer. The commissioner was, both by the application for the writ and the return to it, apprised that the prisoner was within the dominion and jurisdiction of another government, and that no writ of habeas corpus issued by him could pass over the line which divided the two sovereignties.
The conclusion we have reached renders it unnecessary to consider how far the declaration of the prisoner as to his age, in the oath of enlistment, is to be deemed conclusive evidence on that point on the return to the writ.
JUDGMENT REVERSED.
The CHIEF JUSTICE, dissenting
I cannot concur in the opinion just read. I have no doubt of the right of a State court to inquire into the jurisdiction of a Federal court upon habeas corpus, and to discharge when satisfied that the petitioner for the writ is restrained of liberty by the sentence of a court without jurisdiction. If it errs in deciding the question of jurisdiction, the error must be corrected in the mode prescribed by the 25th section of the Judiciary Act; not by denial of the right to make inquiry.
I have still less doubt, if possible, that a writ of habeas corpus may issue from a State court to inquire into the validity of imprisonment or detention, without the sentence of any court whatever, by an officer of the United States. The State court may err; and if it does, the error may be corrected here. The mode has been prescribed and should be followed.
To deny the right of State courts to issue the writ, or, what amounts to the same thing, to concede the right to *413 issue and to deny the right to adjudicate, is to deny the right to protect the citizen by habeas corpus against arbitrary imprisonment in a large class of cases; and, I am thoroughly persuaded, was never within the contemplation of the Convention which framed, or the people who adopted, the Constitution. That instrument expressly declares that "the privilege of the writ of habeas corpus shall not be suspended, unless when, in case of rebellion or invasion, the public safety may require it."
NOTES
[*] 21 Howard, 506.
[*] In the matter of Severy, 4 Clifford. In the matter of Keeler, Hempstead, 306.