UNITED STATES v. CASEY et al.

(District Court, S. D. Ohio, E. D. January 11, 1918.)

No. 976.

1. CRIMINAL LAW ⬥304(10)—JUDICIAL NOTICE.

An indictment charging a conspiracy to violate Selective Service Act May 18, 1917, c. 15, § 13, and the regulation of the Secretary of War promulgated thereunder, need not set forth the regulation of the Secretary, for the courts will take judicial notice thereof.

2. INDICTMENT AND INFORMATION ⬥125(5½)—OFFENSES—DUPLICITY.

An indictment charging that defendants conspired to set up and keep a house of ill fame, bawdyhouse, and brothel within five miles of a military post, in violation of Selective Service Act May 18, 1917, § 13, and the regulation of the Secretary of War promulgated in pursuance of the section, charges a single offense, for a conspiracy is an offense entirely distinct from the crimes the parties intended to commit, and hence, though the conspiracy was to commit several offenses, only one offense was committed by so conspiring.

3. INDICTMENT AND INFORMATION ⬥125(8)—OFFENSES—"HOUSE OF ILL FAME" —"BAWDYHOUSE"—"BROTHEL."

The terms "house of ill fame," "bawdyhouse," and "brothel" are synonymous, all denoting a resort of prostitutes, the only distinction being that the former term refers to the fame of the place, and hence an indictment charging a conspiracy to keep all three resorts charges but one offense (citing Words and Phrases, First Series, House of Ill Fame; Second Series, Brothel; see, also, Words and Phrases, First and Second Series, Bawdyhouse).

4. CONSTITUTIONAL LAW ⬥62—SEPARATION OF POWERS—DELEGATION OF AUTHORITY.

Selective Service Act May 18, 1917, § 13, authorizing the Secretary of War to do everything necessary to suppress and prevent the keeping or setting up of houses of ill fame within such distance as he may deem needful of any military camp, station, fort, post, cantonment, or training or mobilization place, and declaring that any person, corporation, partnership or association, receiving or permitting to be received for immoral purposes any person into any place, structure, or building used for the purpose of lewdness, etc., within such distance of military stations as may be designated, shall be deemed guilty of a misdemeanor and punished, is not unconstitutional, as delegating legislative power to the Secretary of War as the head of an executive department of the government, for the statute itself defines the offense, and merely makes the Secretary of War the agent of Congress to determine and declare the zone within which the will of Congress shall take effect.

5. WAR ⬥4—AUTHORITY—POLICE POWER.

Such statute is not unconstitutional, as an assumption of and an attempt to interfere with the police power of the states to regulate the morals of their citizens, thus invading the reserved powers of the states, for while the states have power to control the morals of their citizens, and may prosecute the keepers of bawdyhouses, Congress may under the war power prohibit the keeping of such immoral resorts within a prescribed territory surrounding military camps.

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

6. CRIMINAL LAW ⊙⇒201—FORMER JEOPARDY—WHAT CONSTITUTES.

A conviction under the state laws for maintaining a brothel located so near a military post, camp, etc., as to fall within the prohibited zone prescribed by the Secretary of War under Selective Service Act May 18, 1917, § 13, does not prevent a conviction under such act.

7. WAR ⊙⇒4—POWERS—WAR POWERS.

The execution of the unrestricted war powers conferred upon Congress by Const. art. 1, § 8, falls within the line of duties of the national government, and its control over matters pertaining to war is plenary and exclusive.

8. ARMY AND NAVY ⊙⇒40—WAR POWERS—CONSTRUCTION.

Const. art. 1, § 8, empowers Congress to declare war, to raise and support armies, to provide and maintain a navy, and to make rules for the government and regulation of the land and naval forces, while the last clause of that article declares that Congress shall have power to make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by the Constitution in the government of the United States. Selective Service Act May 18, 1917, § 13, makes it an offense to keep or set up brothels within a zone around military camps or posts to be prescribed by the Secretary of War. *Held*, that the act was within the powers of Congress, for the war power resides in the nation's right of self-preservation, not only of itself, but of all of its citizens, and the war power of Congress being plenary, it can pass acts to protect soldiers from the results of dissipation, for not only would such dissipation lead to a lessening of their efficiency as soldiers, but might render them unfit as citizens.

Thomas Casey and others were indicted for conspiracy to violate Selective Service Act May 18, 1917, § 13, and the regulation of the Secretary of War promulgated in pursuance of that section, by keeping and setting up a house of ill fame within five miles of a military post or station used for military purposes. On motion to quash and demurrer. Motion to quash and demurrer overruled.

Stuart R. Bolin, U. S. Dist. Atty., of Columbus, Ohio.

C. D. Saviers, of Columbus, Ohio, for defendants.

SATER, District Judge. The indictment charges that Casey and others, on or about July 31, 1917, knowingly, willfully, unlawfully, and feloniously entered into a conspiracy, which continued down to November 5th, to violate section 13 of the Selective Service Act of May 18, 1917, and the regulation of the Secretary of War promulgated in pursuance of that section, by keeping and setting up a house of ill fame, bawdyhouse, and brothel within five miles of the military post or station used for military purposes and known as the Columbus Barracks, and by receiving and permitting to be received at such house for immoral purposes various named persons. Six overt acts are alleged to have been committed to effect the object of such conspiracy. Motions to quash have been filed, and, that the court may consider at one time all the objections raised to the indictment, demurrers also have been tendered, to be filed after the order on the motions to quash has been entered, should such motions be overruled.

[1] It is not necessary, as claimed by the defendants, that the regulation promulgated by the Secretary of War should be set forth in the indictment. Byrne, Fed. Crim. Proc. § 147, and cases cited. A

regulation of that character receives judicial notice, and each of the defendants was chargeable with knowledge of it.

[2, 3] The statute and the Secretary's regulation make it an offense either to set up or to keep a house of ill fame, brothel, or bawdyhouse within the prohibited zone. The contention that the indictment is duplicitous, in that the language "keeping and setting up" charges two offenses, and the use of the words "house of ill fame, bawdyhouse, and brothel" amounts to a charge of committing three offenses, must be decided adversely to the defendants, for the reason that a conspiracy is an offense entirely distinct from the crimes the parties intended to commit thereby. 4 Ency. Pl. & Pr. 719; John Gund Brewing Co. v. United States, 206 Fed. 386, 124 C. C. A. 268; State v. Sterling, 34 Iowa, 443, 444; State v. Kennedy, 63 Iowa, 197, 200, 18 N. W. 885; Noyes v. State, 41 N. J. Law, 418, 420, 421. The offense charged is not that the defendants set up and kept such places, but that of conspiracy to set them up and keep them, and the commission of overt acts in furtherance of that conspiracy. The fallacy in the defendants' position is that it confounds the crime, which is the conspiracy, with the objects of the conspiracy. A combination to commit several crimes is a single offense, and the offense can always be laid according to the truth. If, therefore, it is a fact that the defendants conspired to violate the law in question in two or more distinct particulars with respect to such combination, the criminal act was single, and such it appears to be on the face of the indictment. According to the decisions of the courts, the lexicographers and text-writers on the law, the terms "house of ill fame," "bawdyhouse," and "brothel" are synonymous. State v. Boardman, 64 Me. 523, 529; State v. Smith, 29 Minn. 195, 12 N. W. 524; Worcester's Dict.; Century Dict.; Bouvier's Law Dict.; Wharton, Crim. Law (11th Ed.) § 1720. See also cases cited in Words and Phrases Jud. Def., vol. 4, First Series, 3359, and vol. 1, New Series, 507. The only distinction between "bawdyhouse" and "house of ill fame" is that the former term has no reference to the fame of the place, but denotes the fact that it is a resort for the purposes of prostitution. State v. Smith; Wharton, Crim. Law (11th Ed.) § 1720, note.

[4] The insistence that the act is unconstitutional, as delegating legislative power to the Secretary of War as the head of an executive department of the government, is unavailing. The applicable rule is thus stated in Field v. Clark, 143 U. S. 649, 694, 12 Sup. Ct. 495, 505 (36 L. Ed. 294):

"The Legislature cannot delegate its power to make a law; but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend. To deny this would be to stop the wheels of government. There are many things upon which wise and useful legislation must depend, which cannot be known to the law-making power, and must, therefore, be a subject of inquiry and determination outside of the halls of legislation."

The Secretary did not make the law under consideration. He was the mere agent of Congress to ascertain and declare the zone within which the statute, which expresses the will of Congress, should take effect. The prosecution would fail, if the law empowered and directed

the Secretary of War by regulation to make the keeping of a house of ill fame within five miles of a military station criminal. All that he was empowered and directed to do was to make the regulation. The regulation promulgated by him does not declare its violation a punishable offense. It is the act of Congress which declares that the violation of such regulation after its promulgation shall constitute a misdemeanor by the person transgressing it, and that he shall be fined or imprisoned, or both, as a penalty therefor. United States v. Breen, (C. C.) 40 Fed. 402; Railroad Co. v. Commissioners, 1 Ohio St. 77, 88, 89; Union Bridge Co. v. United States, 204 U. S. 364, 27 Sup. Ct. 367, 51 L. Ed. 523; Dastervignes v. United States, 122 Fed. 30, 58 C. C. A. 346 (C. C. A. 9); United States v. Ormsbee (D. C.) 74 Fed. 207.

[5, 6] It is charged that the act is unconstitutional, as an assumption of and an attempt to interfere with the police power of the state to regulate the morals of its citizens, and as an invasion of the reserved powers of the state. That the state in the exercise of its police power has the right to legislate, and in pursuance of that right has legislated, to control the morals of its citizens, and may prosecute the keepers of bawdyhouses, is freely conceded; but their conviction and sentence for that offense in the state court, had action been taken against them there, would not bar their prosecution in this court. Cross v. North Carolina, 132 U. S. 131, 139, 10 Sup. Ct. 47, 33 L. Ed. 287; Sexton v. California, 189 U. S. 319, 323, 23 Sup. Ct. 543, 47 L. Ed. 833; Byrne, Fed. Crim. Proc. § 211. The attitude of the government is that Congress, not in the exercise of the police power, but in the exercise of the war power conferred upon it by the federal Constitution, may also, as a matter of right, prohibit the presence of such places within the prescribed territory without encroaching on the jurisdiction of the state. The extent of such war power is therefore the interesting and important question for decision. If the statute is a valid exercise of that power, then it is a part of the supreme law of the land, and all persons are subject to it.

[7, 8] The war power resides in the nation's right of self-preservation—the preservation not only of itself, but of all of its citizens. Vattel, Law of Nations (Chitty's Ed.) star pp. 5, 6, 154, 291; United States v. Pierce (D. C.) 245 Fed. 878, 883; Tod v. Fairfield Common Pleas, 15 Ohio St. 377, 390. The federal Constitution specifically confers the right of national self-preservation and intrusts the means of enforcing such right to the discretion of Congress. Article 1, § 8, empowers Congress "to declare war" (clause 11), "to raise and support armies" (clause 12), "to provide and maintain a navy" (clause 13), and "to make rules for the government and regulation of the land and naval forces" (clause 14). The execution of these unrestricted powers falls within the line of duties of the national government, its control over all matters pertaining to war being plenary and exclusive. Tarble's Case, 13 Wall. 397, 408, 20 L. Ed. 597; Tod v. Fairfield Common Pleas, 15 Ohio St. 389. The power to declare and wage war carries with it the power to conduct it successfully. The business of the United States, as a warrior, is to conquer, to restore peace and to

maintain the government.    Mechanics' & Traders' Bank v. Union Bank, 25 La. Ann. 387.   It is not necessary, in order to prove the particular authority to enact the specific statutory provisions against vice, which are now under consideration, to show a particular and express constitutional grant.   The design of the Constitution was to establish a government to direct and administer the affairs of a great and growing nation and at the same time to fix by sufficiently distinct lines the sphere of its operations.   To accomplish this purpose it was only necessary to make express grants of general powers, coupled with the grants of such incidental and auxiliary powers as might be necessary or proper in the exercise of the powers expressly granted.   These necessarily extensive incidental or implied powers, to which a large part of our existing national legislation is due, are found in clause 18 of article 1, § 8, which confers on Congress the authority "to make all Laws which shall be necessary and proper for carrying into execution the foregoing powers and all other powers vested by this Constitution in the government of the United States, or in any department or officer thereof."   The word "necessary," occurring in such clause, was held in McCulloch v. Maryland, 4 Wheat. 316, 4 L. Ed. 579, not to be used in the strict and rigorous sense of indispensably necessary, but in the more mitigated sense which common usage justifies, and as in the common affairs of the  world or in approved authorities, and to import no more than that one thing is convenient, or useful, or essential to another.   "To make all laws which shall be necessary and proper for carrying into execution" the war powers of the Constitution, which are complete within themselves, must be understood as empowering Congress, as an incident to them, to employ any appropriate means calculated to wage war successfully.   In McCulloch v. Maryland, Mr. Chief Justice Marshall said (4 Wheat. 420, 4 L. Ed. 579):

"We think the sound construction of the Constitution must allow to the national Legislature that discretion, with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it, in the manner most beneficial to the people. Let the end be legitimate, let it be within the scope of the Constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the Constitution, are constitutional."

The line of distinction between what constitutes an exercise of war power and what is a legitimate police regulation may at times appear to be dim and shadowy, but the two powers are separate and distinct. In Bierly, Police Power, Federal and State, pp. 6 and 7, it is said that:

"The war power is sovereign, and yet it is not the police power, for it is exercised to preserve the sovereignty itself, rather than the health, or economy, or morals of a community."

Congress has the undoubted right to go beyond general regulations for the conduct of a war and descend to the most minute directions, if it shall deem it advisable so to do.   Its right to exercise power in that behalf is as great, at least, as its power under the commerce clause of the Constitution, as declared in Hoke v. United States, 227 U. S. 308, 323, 33 Sup. Ct. 281, 57 L. Ed. 523, 43 L. R. A. (N. S.) 906, Ann. Cas. 1913E, 905, in which the legislation there under

consideration (White Slave Act June 25, 1910, c. 395, 36 Stat. 825 [Comp. St. 1916, §§ 8812–8819]) partook of the quality of a police regulation. See, also, Glouster Ferry Co. v. Pennsylvania, 114 U. S. 196, 215, 5 Sup. Ct. 826, 29 L. Ed. 158. It is the exercise of the existing implied powers which enables Congress to legislate to meet the exigencies resulting from new conditions and new methods of business (McCulloch v. Maryland, 4 Wheat. 415, 4 L. Ed. 579), and which frequently, but erroneously, gives rise to the application of the term "flexibility" or "elasticity" to the Constitution. The novelty of the legislation here in question affords no proof of its want of constitutionality or of a straining of our fundamental law. The wisdom of the framers of the Constitution in committing to the discretion of Congress the choice of appropriate means for executing the great powers (including the war power) on which the welfare of the nation essentially depends, was thus tersely and vigorously stated in the last-named case (4 Wheat. at page 415, 4 L. Ed. 579):

"To have prescribed the means by which government should, in all future time, execute its powers, would have been to change, entirely, the character of the instrument, and give it the properties of a legal code. It would have been an unwise attempt to provide, by immutable rules, for exigencies which, if foreseen at all, must have been seen dimly, and which can be best provided for as they occur. To have declared that the best means shall not be used, but those alone without which the power given would be nugatory, would have been to deprive the Legislature of the capacity to avail itself of experience, to exercise its reason, and to accommodate its legislation to circumstances."

The Constitution does not define the measures to be taken in carrying on war, but authorizes Congress, to whom the war power is confided, to make all such laws to carry into effect the expressly granted powers relating to that subject, as that body in the exercise of its sole discretion may deem proper. Stewart v. Kahn, 11 Wall. 493, 506, 507, 20 L. Ed. 176. Were the power to conduct war and to maintain efficiency in the army dependent in any degree upon the pleasure of the states, it would in all probability be unequally exerted and the government might suffer disaster by obstruction to an adequate exercise of such power on the part of unfriendly states. Tarble's Case, 13 Wall. 397, 408, 20 L. Ed. 597; Re Debs, 158 U. S. 564, 578, 15 Sup. Ct. 900, 39 L. Ed. 1092.

Does the act in question contemplate national self-preservation? To ascertain its purpose, other pertinent provisions may be considered. It provides by voluntary enlistment and conscription for the raising, organizing, and equipping of a great army to prosecute against a powerful enemy a war provoked by repeated wrongs inflicted on us as a nation. Good order, subordination, and efficiency are nowhere so necessary to national protection as in the army. To insure these qualities section 12 of the act declares that the President may make such regulations governing the prohibition of alcoholic liquors in or near military camps, and to the officers and enlisted men of the army, as he from time to time may deem necessary or advisable; that no person, natural or artificial, shall sell or supply or have in his possession any intoxicating or spirituous liquors at any military station, can-

tonment, camp, fort, post, officers' or enlisted men's club, in use at the time for military purposes under the statute, but that the Secretary of War may prescribe regulations permitting the sale and use of intoxicants for medicinal purposes; and that it shall be unlawful and a punishable offense to sell any intoxicating liquors, including beer, ale or wine, to any officer or member of the military forces while in uniform, except as in the act provided. Section 13 authorizes, empowers, and directs the Secretary of War during the present war to do everything by him deemed necessary to suppress and prevent the keeping and setting up of houses of ill fame, brothels, and bawdyhouses within such distance as he may deem needful of any military camp, station, fort, post, cantonment, or training or mobilization place, and declares that any person, natural or artificial, receiving or permitting to be received for immoral purposes any person into any place, structure, or building used for the purpose of lewdness, assignation, or prostitution, within the distance so designated, or shall permit any such person to remain for immoral purposes in any of such places, so designated, or who shall violate the regulation promulgated by the Secretary of War to carry out the object and purpose of such section, shall be guilty of a misdemeanor, and be punished by fine or imprisonment, or both.

The statute was framed in recognition of the fact that the greatest efficiency attainable by an army depends upon the sobriety, healthfulness, and high moral tone of the soldiers composing it. Soldiers addicted to the use or under the influence of liquor are less orderly, less obedient, less competent to discharge their duties, and more prone to disease than when in their normal condition. If afflicted by any of the loathsome diseases which may be contracted in bawdyhouses, they are not only unfitted temporarily at least for the performance of duties, but in some instances, on account of the communicability of such diseases, become a menace to those with whom they are associated. The nation, for its safety, is entitled at all times to the best service of which its soldiers and all of its soldiers are capable. This praiseworthy statute also operates for economy and for the safety of our soldiers and is a pledge to their relatives and friends that they shall be so cared for as will not only best protect their country, but also themselves in times of peril, and that they will not be returned home, dissolute in habits, addicted to drink, or victims of foul and infectious disease. Congress, in the legitimate exercise of the war powers vested in it by the Constitution, has declared that, inasmuch as the efficiency, good health, and sound morals of the army are conducive to the preservation of the nation, restrictions upon the sale of intoxicants, and the discontinuance of houses of ill fame, bawdyhouses, and brothels, as a means to that end, are necessary within given territorial limits during the existence of the present war, and its enactment is the supreme law of the land. In answer to the argument that the power to establish the ordinary regulations of police has been left to the individual states, and cannot be assumed by the national government, it is sufficient to say that the statute here assailed rests, not upon the police power, but upon the war power, conferred on Congress and recognized by the law of nations.

No case determining the validity of section 13 of the statute here under consideration has been cited, excepting United States v. Smith, decided by Judge Newman, apparently without his filing a written opinion; but many decisions, the advance sheets of which are in my possession, have been handed down sustaining various sections and clauses of the act. Helpful and pointed utterances are found in McCormick v. Humphrey, 27 Ind. 144, 154, Tod v. Fairfield Common Pleas, 15 Ohio St. 377, and Knoefel v. Williams, 30 Ind. 1, all of which involve the constitutionality of war measures enacted pending the Civil War; but an extended review of those cases, illuminating as they are, is not deemed necessary.

It follows that an order may be entered overruling the motion to quash, after which the demurrer may be filed. It also is overruled.