## PAPPENS et al. v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. July 1, 1918. Rehearing Denied October 14, 1918.)

No. 3130.

1. WAR ☞1—KEEPING OR SETTING UP BAWDYHOUSE IN MILITARY ZONE—VIOLATION OF ORDER OF SECRETARY OF WAR—STATUTE.

An indictment charging keeping or setting up a house of ill fame within five miles of any military camp, etc., though without averment of the receiving of any persons into the house for the purpose of prostitution, charges a misdemeanor, for though the offense charged is violation of an order or regulation issued by the Secretary of War, the order was made pursuant to Act May 18, 1917, c. 15, § 13, making violation of any such order a misdemeanor.

2. WAR ☞4—SUPPRESSING BAWDYHOUSES WITHIN MILITARY ZONE—POLICE POWER OF STATE.

Under Const. art. 1, § 8, rule of Secretary of War providing that keeping or setting up of houses of ill fame, etc., within five miles of any military camp, etc., is prohibited authorized by, Act May 18, 1917, c. 15, § 13, authorizing and directing Secretary of War to do everything deemed necessary to suppress and prevent keeping or setting up of houses of ill fame within needful distances of any military camp, etc., was not invasion of police power reserved to state, therefore in excess of power of Congress.

3. WAR ☞4—NATIONAL POWERS TO WAGE WAR—CONTROL OF CONGRESS.

The execution of the powers to raise and support armies and to make rules for their government, assigned to the national government by the federal Constitution, comes within the obligations or duties of Congress; its control over the subject being plenary.

4. WAR ☞4—POWER OF CONGRESS.

In making provision for waging war, Congress, in protection of the common good, may enact such legislation as its wisdom deems essential, excepting interference with the power vested in the President with respect to the command of the forces and conduct of campaigns.

5. CRIMINAL LAW ☞829(4)—ENTRAPMENT—INSTRUCTION.

In prosecution for violating rule of Secretary of War prohibiting keeping or setting up of house of ill fame within five miles of military fort, etc., instruction that courts will not sanction conviction of person based upon circumstances showing he was induced by officers to commit the offense, that he might be brought to punishment, sufficiently covered point in defendants' request, though coupled with explanation that, if officers received information crime was being committed secretly, it was their right to ascertain truth.

In Error to the District Court of the United States for the First Division of the Northern District of California; Wm. C. Van Fleet, Judge.

Ernest Pappens and Marie T. Pappens were convicted of keeping a house of ill fame within five miles of a military fort, and they bring error. Affirmed.

Samuel M. Shortridge, of San Francisco, Cal., for plaintiffs in error.

John W. Preston, U. S. Atty., of San Francisco, Cal., and James E. Colston, Sp. Asst. U. S. Atty., of San Francisco, Cal.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

HUNT, Circuit Judge. The defendants, plaintiffs in error, were convicted under two counts of an indictment charging them with willfully and knowingly keeping a house of ill fame, in which prostitution was carried on in the city of San Francisco, at a place known as the Palm Hotel; the said house being within five miles of a military fort, to wit, Ft. Mason and the Presidio of San Francisco, the said fort and Presidio being used for military purposes of the United States. The act of Congress under which the indictment is drawn is entitled:

"An act to authorize the President to increase temporarily the military establishment of the United States." Act May 18, 1917, c. 15, 40 Stat. p. 76.

Section 13 provides as follows:

"Sec. 13. That the Secretary of War is hereby authorized, empowered, and directed during the present war to do everything by him deemed necessary to suppress and prevent the keeping or setting up of houses of ill fame, brothels, or bawdy houses within such distance as he may deem needful of any military camp, station, fort, post, cantonment, training, or mobilization place, and any person, corporation, partnership, or association receiving or permitting to be received for immoral purposes any person into any place, structure, or building used for the purpose of lewdness, assignation, or prostitution within such distance of said places as may be designated, or shall permit any such person to remain for immoral purposes in any such place, structure, or building, as aforesaid, or who shall violate any order, rule, or regulation issued to carry out the object and purpose of this section shall, unless otherwise punishable under the Articles of War, be deemed guilty of a misdemeanor and be punished by a fine of not more than $1,000, or imprisonment for not more than twelve months, or both."

After the passage of the act the Secretary of War made a rule which provided that the keeping or setting up of houses of ill fame, brothels, or bawdyhouses within five miles of any military camp, fort, training or mobilization place being used for military purposes by the United States is prohibited.

[1] It is said that, inasmuch as there is no averment of the receiving of any persons into a house used for the purpose of prostitution, the offense charged here is but the violation of a rule made by the Secretary of War. This is true in so far as it is said that the offense charged is a violation of an order or regulation issued by the Secretary of War; but it is also true that the rule violated was made pursuant to the statute which empowers and authorizes the Secretary, during the war, to do everything by him deemed necessary to suppress and prevent the keeping or setting up of houses of ill fame, within such distance as he may deem necessary, of any military camp, and which makes violation of any such order a misdemeanor.

In United States v. Grimaud, 220 U. S. 506, 31 Sup. Ct. 480, 55 L. Ed. 563, the Supreme Court, reaffirming the principle that Congress cannot delegate legislative power to an executive officer, held that the authority to make administrative rules is not a delegation of legislative power, and that such rules were not raised from an administrative to a legislative character because the violation thereof is punished as a public offense. In that case the defendant was indicted for violation of a rule making it unlawful to graze sheep on a forest reserve. Justice Lamar, for the court, said:

"The Secretary of Agriculture could not make rules and regulations for any and every purpose. Williamson v. United States, 207 U. S. 462 [28 Sup.

Cf. 163, 52 L. Ed. 278]. As to those here involved, they all relate to matters clearly indicated and authorized by Congress. The subjects as to which the Secretary can regulate are defined. The lands are set apart as a forest reserve. He is required to make provisions to protect them from depredations and from harmful uses. He is authorized 'to regulate the occupancy and use and to preserve the forest from destruction.' A violation of reasonable rules regulating the use and occupancy of the property is made a crime, not by the Secretary, but by Congress. The statute, not the Secretary, fixes the penalty. * * * The Secretary did not exercise the legislative power of declaring the penalty or fixing the punishment for grazing sheep without a permit, but the punishment is imposed by the act itself. The offense is not against the Secretary, but, as the indictment properly concludes, 'contrary to the laws of the United States and the peace and dignity thereof.'" Estes v. United States, 227 Fed. 818, 142 C. C. A. 342.

The doctrine of that decision is controlling, because in the statute now under examination Congress has declared that the Secretary shall do all in his power to suppress the keeping of houses of prostitution within reasonable distances of a military post and has given him power to carry out the objects of the statute.

[2] Defendants argue that the rule in question, even if authorized by Congress, was an invasion of the police power reserved to the state of California, and therefore in excess of the power of Congress. We cannot sustain the contention. Congress, having acted under its constitutional power in declaring that the state of war between Germany and the United States exists, found it necessary and proper that there should be the exercise of the additional constitutional powers "to raise and to support armies," and also "to make rules for the government and regulation of the land and naval forces."

[3] The execution of these powers assigned to the national government came within the obligation or duties of Congress, and its control over the subject is plenary. Tarble's Case, 80 U. S. (13 Wall.) 397, 20 L. Ed. 597. Power to raise an army to carry on the war was recognized by the pledge of Congress (by joint resolution approved April 6, 1917 [40 Stat. 1]) of all the resources of the country "to bring the conflict to a successful termination," and has been executed by the several acts of legislation providing for the organization and support of the Army and Navy and to promote the efficiency thereof. It is obvious that, to avoid calamity to the nation, the powers referred to in their greatest strength must be upheld as indispensably incidental to the power to declare war. It has been written by Story, in reference to the unlimited power of Congress to raise and support armies, that to be of value the power must be unlimited. "It is impossible," he wrote, "to foresee or define the extent and variety of national exigencies and the correspondent extent and variety of the national means necessary to satisfy them. The power must be coextensive with all possible combinations of circumstances, and under the direction of the councils intrusted with the common defense. To deny this would be to deny the means, and yet require the end. These must therefore be unlimited in every matter essential to its efficacy; that is, in the formation, direction, and support of the national forces." 2 Story on the Constitution, § 1183.

[4] The power to make rules and regulations for the government of the land and naval forces naturally accompanies the power to raise

and maintain such forces, and extends to the necessities and emergencies which may arise and call for the exercise of the power. The Constitution did not define the boundaries of the powers under consideration, but in making provision for carrying on the war Congress, in protection of the common good, may enact such legislation as in its wisdom it deems essential to the prosecution of the war with vigor and success, excepting interference with the power vested in the President with respect to the command of the forces and the conduct of campaigns.

The protection, it may be the existence, of the nation depends upon the efficiency of the Army and Navy and the service of those in it. And we have no real doubt that, if Congress deems it necessary to help keep the Army in its greatest efficiency to suppress and prevent the keeping of houses of ill fame during the war within certain distances of military posts, it may, in the exercise of part of its war power, make laws which will carry its will into execution. Article 1, § 8, of the Constitution; United States v. Casey (D. C.) 247 Fed. 362.

Possible infringement upon the police power of the state is not an impediment, for the statute is an exercise of war power, and the authority conferred upon the Secretary of War by section 13, supra, is expressly limited to the duration of the present war.

[5] Defendants argue that their rights were prejudiced, because the court refused to charge the jury that, if it were found that the officers of the government, or persons employed by the government officers, advised or instigated or induced or procured defendants to violate the law, defendants should be acquitted. But the court sufficiently covered the point by charging the jury that officers of the government have no right primarily to proceed to induce a person who would not otherwise commit the offense charged simply for the purpose of arresting them and bringing them to punishment; that the courts do not recognize such a right in officers and will not sanction the conviction of a person based upon circumstances which disclose any such methods of procedure. In further explanation the court said, however, that if the officers of the law received information leading them to believe that crime was being committed in a more or less secret way, it was their right to take such steps as the testimony showed had been taken to ascertain whether in fact the offense charged was being committed, and said that, if the testimony of the prosecution was believed, nothing reprehensible was done "so far as tending to disclose a case of inducing or entrapping" the defendants into committing acts with which they were charged. The jury were also told that they should review the evidence in the case, and say whether or not it showed the guilt of the defendants, or failed to do so, within the principle stated. We have carefully read all the testimony, and are of the opinion that the instruction was correct and applicable to the case, which was brought fairly within the rule of Freeman v. United States, 243 Fed. 353, 156 C. C. A. 133.

Other points made have had our careful consideration, but furnish no ground for reversal.

The judgment is affirmed.