

# OFFICE OF THE ATTORNEY GENERAL OF TEXAS

## AUSTIN

GERALD C. MANN
ATTORNEY GENERAL

Honorable Coke R. Stevenson
Governor of Texas
Austin, Texas

Dear Governor Stevenson:          Opinion No. O-4646
                                  Re: Whether or not black-out
                                  regulations promulgated by
                                  the President of the United
                                  States as Commander-in-Chief
                                  of the Armies of the United
                                  States and the Officers un-
                                  der his command will super-
                                  sede the provisions of Sec-
                                  tion 7 of Article 1112b,
                                  Vernon's Annotated Penal
                                  Code, requiring the burning
                                  of gas resulting from the
                                  production of oil wells.

          This will acknowledge your letter of June 4, 1942, en-
closing copy of a letter you received from Mr. George Sawtelle,
President of the Mid-Continent Oil and Gas Association, dated
May 11, 1942, copy of the shore lighting regulations promulgated
by Major-General Richard Donovan, commanding the Eighth Corps
Area, dated June 1, 1942, and copy of Public Proclamation No. 1,
by Lieutenant-General Walter Krueger of the United States Army,
commanding the Southern Defense Command, dated May 30, 1942.

          The substance of your request is whether or not an
Executive Order of the President, the Secretary of War, or one
of the officers of the United States Army under the command of
the President as Commander-in-Chief of the Army and Navy, requir-
ing the extinguishment of gas flares, burning as required by Sec-
tion 7 of Article 1112b, Vernon's Annotated Penal Code, will
supersede that statute.

"Section 4. The sum of Five Thousand
Dollars ($5000.00), or so much thereof as
may be necessary, is hereby appropriated out
of any funds in the Treasury of the State
not otherwise appropriated to pay the ex-
penses of such publication and election,
which shall be refunded to the State of
Texas by Red River County out of its General
Fund or any other Available Fund. Provided
that no election shall be held until Red
River County shall first deposit with the
State Treasurer the sum of Five Thousand
Dollars ($5000.00) with which to pay such
expense of said election."

You advise that the deposit required by the reso-
lution was never made by Red River County, and that the ex-
pense of such election has not yet been paid to the State
by Red River County. You are further advised that, appar-
ently overlooking the fact that the election was not to be
held until after such time as Red River County had deposit-
ed with the State Treasurer the required $5000.00, the
Secretary of State proceeded with the arrangements for
the election, and the election was actually held.

Upon these facts, you submit the question whether
the State has a claim against Red River County for the ex-
penses of holding such election; and also whether the Sec-
retary of State is personally liable.

Any liability of the then-Secretary of State
would depend upon the question whether the provision of
the resolution that no election should be held until Red
River County should deposit $5000.00 with the State Treasur-
er was valid. It is our opinion that such provision is un-
constitutional. Article 17 of the Constitution confers the
authority upon the Legislature to propose constitutional
amendments. It requires that the Legislature, in proposing
constitutional amendments, shall specify the time of the
election. "* * * The Constitution does not warrant a con-
ditional provision for the election, or provision for a con-
ditional election. The right to the election is absolute
and can not be defeated. * * *." — Cartledge v. Northam,
(Tex. Sup. Ct.) 153 S. W. 297. The condition is void, and
is ineffectual to displace the requirement of the resolution
that the election shall be held on a specified day. — Cart-

of War, contrary to the restrictions applicable
to any such area or zone or contrary to the order
of the Secretary of War or any such military com-
mander, shall, if it appears that he knew or should
have known of the existence and extent of the restric-
tions or order and that his act was in violation there-
of, be guilty of a misdemeanor and upon conviction
shall be liable to a fine of not to exceed $5,000
or to imprisonment for not more than one year, or
both, for each offense." (March 21, 1942, c. 191,
56 Stat; 18 U. S. C. A. § 97a)

Thus it may be seen by the Act of March 21, 1942, the
Congress made it a misdemeanor to commit any act in any mili-
tary area prescribed under the authority of an Executive Order
of the President by the Secretary of War, or by any military
commander designated by the Secretary of War, contrary to the
restrictions applicable to any such area or contrary to the
orders of the Secretary of War or any such military commander.

On May 30, 1942, Lieutenant-General Walter Krueger,
commanding the Southern Defense Command of the United States,
promulgated and issued Public Proclamation No. 1, designating
as a military area, Texas Military Area No. 1, embracing all
of the territory within the following counties of the State
of Texas, to-wit:  Aransas, Brazoria, Brewster, Calhoun, Cameron,
Chambers, Culberson, Dimmit, El Paso, Galveston, Harris, Hidalgo,
Hudspeth, Jackson, Jeff Davis, Jefferson, Kleberg, Kennedy,
Kinney, Liberty, Matagorda, Maverick, Nueces, Orange, Pecos,
Presidio, Refugio, San Patricio, Starr, Terrell, Val Verde,
Victoria, Webb, Willacy and Zapata.

Said Proclamation of May 30, 1942, further provided that
the protection of American commerce and that of the United Nations
from damage or destruction by enemy attack involved the effective
control of artificial lighting along the southern boundaries of
the Southern Defense Command; and for a reasonable distance in-
land therefrom and that Corps Area Commanders are designated as
authorities to promulgate the necessary restrictions and orders
for control prescribed by the Commanding General of the Southern
Defense Command.

Honorable Coke R. Stevenson, page 4

Pursuant to the authority thus vested in him, Major-General Richard Donovan, commanding the Eighth Corps Area and all of the zone designated as Texas Military Area No. 1, did on June 1, 1942, promulgate regulations and restrictions for the control of shore lighting in said area.

We understand that it has been suggested to you that these regulations and restrictions will be specifically extended to cover the extinguishment of flares burning gas in the course of the production of oil from oil fields located in said Texas Military Area No. 1.

It is our opinion and you are advised that when Major-General Donovan or other appropriate authorities so promulgate and extend the restrictions for Texas Military Area No. 1 so as to cover the extinguishment of gas flares, the provisions of Section 7 of Article 1112b of Vernon's Annotated Penal Code, will be suspended insofar as there may be conflict-for the duration of the war. We express no opinion as to whether or not the restrictions of June 1, 1942, have that effect.

In time of War, Congress and the President under its direction and as Commander-in-Chief, hold the supreme power over the conduct of any of the affairs of the Nation when it is necessary to take action for the successful prosecution of the war. As specificially stated in 67 Corpus Jurisprudence, at page 372:

"A state has no right to hinder or embarrass the United States, directly or indirectly, in carrying out its power to make war, and no local statute can be permitted to stand as a bar to the effective exercise of the war power of the federal government."

In McKinley v. United States, 249 U. S. 387, 39 S. Ct. 324, 63 L. Ed. 668, the United States Supreme Court held that the Secretary of War might lawfully promulgate rules and regulations (as authorized by Congress) for the suppression and prevention of houses of ill-fame in the vicinity of places where the military forces of the United States were situated. To the same

effect are <u>United States v. Casey</u>, 247 Fed. 362, holding that the war power extends to the most minute regulation of individual conduct and <u>Tarble's Case</u>, 13 Wal. 397, 20 L. Ed. 597, to the effect that the war power is not subject to interference by the state government.

While not precisely in point, your attention is also directed to the leading case of <u>State v. Burton</u>, 41 R. I. 303, 103 Atl. 962, L. R. A. 1918F, 559. In that case a member of the United States Naval Reserve Force on duty in time of war as a dispatch bearer, was ordered by his superior officer to proceed with all possible dispatch in the performance of a duty assigned him. He was arrested by state authorities, charged with violating the speed laws. The Court said:

"In essence this question is: Are the rules established by the General Assembly regulating the use of highways of the state subordinate to the exigencies of military operations by the federal government in time of war? In our opinion they are. <u>Under the Constitution of the United States, the conduct of the war now existing between this country and Germany vests wholly in the federal government. Any state law, the operation of which will hinder that government in carrying out such constitutional power, is, during the exercise of the power, suspended as regards the national government and its officers, who are charged with the duty of prosecuting the war.</u> The principle is well established that in respect to the powers and duties exclusively conferred and imposed upon the federal government by the Constitution of the United States the several states have subordinated their sovereignty to that of the nation. (Citing cases)

"<u>It is not questioned that in time of war within the territory occupied by the army or the navy, and in the districts effected by military operations, a military commander is empowered, as may overrule the civil authority, and pursue whatever course the necessities of the situation commend to his judgment.</u> Newport is not within the theater of actual conflict. It is, however, the headquarters of the Second naval district. The waters about it are in the actual control of the naval forces of the United States, which are charged with the duty of guarding our coasts and waterways