## UNITED STATES v. NEWMAN.

### SAME v. BUCHANAN.

Nos. 15430, 15447.

District Court, E. D. Illinois.

April 28, 1942.

Arthur Roe, U. S. Atty., of Vandalia, Ill., and Ray Foreman, Asst. U. S. Atty., of Danville, Ill., for the Government.

Horace Gunn, of Danville, Ill., for defendants.

LINDLEY, District Judge.

Defendants are charged with refusal to comply with the orders of their respective draft boards. One has been classified as a conscientious objector and directed to serve in a noncombatant camp. He claims that the board should have given him complete exemption as a regularly ordained minister of religion. The other also insists that his board should have classified him as a regularly ordained minister and exempted him from all service. The evidence before the boards was disputed and contradictory. Obviously, on the face of the record, each board had before it substantial evidence to support its findings.

Before I proceed to the ultimate decision I think it well to consider the comparatively recent announcement of the Supreme Court of the United States involving liberty of religious service and of conscience and the place that citizens' conscientious scruples have in our conception of constitutional rights, and other relevant precedents.

In Minersville School District v. Gobitis, 310 U.S. 586, 60 S.Ct. 1010, 1012, 84 L.Ed. 1375, 127 A.L.R. 1493, the Court said:

"Centuries of strife over the erection of particular dogmas as exclusive or all-comprehending faiths led to the inclusion of a guarantee for religious freedom in the Bill of Rights. The First Amendment, and the Fourteenth through its absorption of the First, sought to guard against repetition of those bitter religious struggles by prohibiting the establishment of a state religion and by securing to every sect the free exercise of its faith. So pervasive is the acceptance of this precious right that its scope is brought into question, as here, only when the conscience of individuals collides with the felt necessities of society.

"Certainly the affirmative pursuit of one's convictions about the ultimate mystery of the universe and man's relation to it is placed beyond the reach of law. Government may not interfere with organized or individual expression of belief or disbelief. Propagation of belief—or even of disbelief in the supernatural—is protected, whether in church or chapel, mosque or synagogue, tabernacle or meetinghouse. * * *

"But the manifold character of man's relations may bring his conception of religious duty into conflict with the secular interests of his fellow-men. When does the constitutional guarantee compel exemption from doing what society thinks necessary for the promotion of some great common end, or from a penalty for conduct which appears dangerous to the general good? To state the problem is to recall the truth that no single principle can answer all of life's complexities. The right to freedom of religious belief, however dissident and however obnoxious to the cherished beliefs of others—even of a majority—is itself the denial of an absolute. But to affirm that the freedom to follow conscience has itself no limits in the life of a society would deny that very plurality of principles which, as a matter of history, underlies protection of religious toleration. * * * Our present task then, as so often the case with courts, is to reconcile two rights in order to prevent either from destroying the other. * * *

"Conscientious scruples have not, in the course of the long struggle for religious toleration, relieved the individual from obedience to a general law not aimed at the promotion or restriction of religious beliefs. The mere possession of religious convictions which contradict the relevant concerns of a political society does not relieve the citizen from the discharge of political responsibilities. The necessity for this adjustment has again and again been recognized. In a number of situations the exertion of political authority has been sustained, while basic considerations of religious freedom have been left inviolate. * * * In all these cases the general laws in question, upheld in their application to those who refused obedience from religious conviction, were manifestations of specific powers of government deemed by the legislature essential to secure and maintain that orderly, tranquil, and free society without which religious toleration itself is unattainable. * * * We are dealing with an interest inferior to none in the hierarchy of legal values. National unity is the basis of national security. To deny the legislature the right to select appropriate means for its attainment presents a totally different order of problem from that of the propriety of subordinating the possible ugliness of littered streets to the free expression of opinion through distribution of handbills. * * *

"Situations like the present are phases of the profoundest problem confronting a democracy—the problem which Lincoln

cast in memorable dilemma: 'Must a government of necessity be too strong for the liberties of its people, or too weak to maintain its own existence?' * * *

"Judicial review, itself a limitation on popular government, is a fundamental part of our constitutional scheme. But to the legislature no less than to courts is committed the guardianship of deeply-cherished liberties. * * * Where all the effective means of inducing political changes are left free from interference, education in the abandonment of foolish legislation is itself a training in liberty. To fight out the wise use of legislative authority in the forum of public opinion and before legislative assemblies rather than to transfer such a contest to the judicial arena, serves to vindicate the self-confidence of a free people."

Similar language is to be found in Reynolds v. United States, 98 U.S. 145, 25 L. Ed. 244; Davis v. Beason, 133 U.S. 333, 10 S.Ct. 299, 33 L.Ed. 637; Selective Draft Law Cases (Arver v. United States) 245 U.S. 366, 38 S.Ct. 159, 62 L.Ed. 349, L.R.A. 1918C, 361, Ann.Cas. 1918B, 856; Hamilton v. Regents of University of California, 293 U.S. 245, 55 S.Ct. 197, 79 L.Ed. 343.

In Davis v. Beason, supra [133 U.S. 333, 10 S.Ct. 300, 33 L.Ed. 637], the court, a good many years ago, said: "However free the exercise of religion may be, it must be subordinate to the criminal laws of the country, passed with reference to actions regarded by general consent as properly the subjects of punitive legislation."

In Hamilton v. Regents, supra [293 U.S. 245, 55 S.Ct. 204, 79 L.Ed. 343], the court used this language: "There need be no attempt to enumerate or comprehensively to define what is included in the 'liberty' protected by the due process clause. Undoubtedly it does not include the right to entertain the beliefs, to adhere to the principles, and to teach the doctrines on which these students base their objections to the order prescribing military training." And the Supreme Court in United States v. Schwimmer, 279 U.S. 644, 49 S.Ct. 448, 450, 73 L.Ed. 889, said: "Whatever tends to lessen the willingness of citizens to discharge their duty to bear arms in the country's defense detracts from the strength and safety of the government."

In Hamilton v. Regents, supra, the court commented that: "The conscientious objector is relieved from the obligation to bear arms in obedience to no constitutional provision, express or implied; but because, and only because, it has accorded with the policy of Congress thus to relieve him. * * * The privilege of the native-born conscientious objector to avoid bearing arms comes, not from the Constitution, but from the acts of Congress. That body may grant or withhold the exemption as in its wisdom it sees fit; and, if it be withheld, the native-born conscientious objector cannot successfully assert the privilege."

Justice Cardozo, concurring in that case, pointed out that from the beginning of our history, conscientious objectors have, as a matter of policy on the part of our national legislature, been exempt as an act of grace from military service, but that the exemption, when granted, had previously been coupled with the condition that they supply the army with a substitute or the necessary money to hire one. He concludes his concurring opinion by saying: "Manifestly a different doctrine would carry us to lengths that have never yet been dreamed of. The conscientious objector, if his liberties were to be thus extended, might refuse to contribute taxes in furtherance of a war, whether for attack or for defense, or in furtherance of any other end condemned by his conscience as irreligious or immoral. The right of private judgment has never yet been so exalted above the powers and the compulsion of the agencies of government. One who is a martyr to a principle—which may turn out in the end to be a delusion or an error—does not prove by his martyrdom that he has kept within the law."

These enunciations of principles we must look to as guiding posts, keeping in mind that, as the Supreme Court has announced, the grant of exemption to conscientious objectors is not a matter of constitutional right, but wholly an act of grace upon the part of Congress.

The present Act (50 U.S.C.A. Appendix § 310 et seq.) is quite similar to Section 4 of the Act of 1917 (50 U.S.C.A. Appendix § 204). It provides that local boards shall have power to hear and determine all questions or claims with respect to inclusion for, or exemption or deferment from, training and service of all individuals within their respective jurisdictions and that the decisions of such boards shall be final except where an appeal is authorized. The Act further provides that appeals may be taken to the appeal board, under rules prescribed

by the President, and that an appeal may be taken to the President if a question of dependency, or of classification of conscientious objectors in certain cases, is involved. This is set forth in regulations which have been enacted in pursuance of the legislation by authority of Congress.

Under the Act of 1917, the courts held that the boards were quasi-judicial tribunals of inferior and limited jurisdiction (Ex parte Beck, D.C., 245 F. 967); that proceedings before them met the requirements of due process of law (Angelus v. Sullivan, 2 Cir., 246 F. 54; Franke v. Murray, 8 Cir., 248 F. 865, L.R.A. 1918E, 1015); that rules and regulations prescribed under the Act had the force and effect of law (Arver v. United States, 245 U.S. 366, 38 S.Ct. 159, 62 L.Ed. 349, L.R.A. 1918C, 361, Ann.Cas. 1918B, 856; United States ex rel. Feld v. Bullard, 2 Cir., 290 F. 704); and would have judicial notice by the courts (United States v. Miller, D.C., 249 F. 985); that decisions by the local and district boards were conclusive and could not be reviewed by the courts, except in cases where the boards were without jurisdiction, a fair hearing was denied, or their action was arbitrary or unlawful. Franke v. Murray, 8 Cir., 248 F. 865, L.R.A. 1918E, 1015; United States ex rel. Pascher v. Kinkead, 3 Cir., 250 F. 692; Angelus v. Sullivan, 2 Cir., 246 F. 54; Ex parte Platt, D.C., 253 F. 413; Brown v. Spelman, D.C., 254 F. 215; Arbitman v. Woodside, 4 Cir., 258 F. 441.

Unfortunately, there are no precedents upon what may be considered as a defense to an indictment charging that a defendant has failed to comply with the orders of the board, but there are several precedents upon what courts may and may not do in regard to release of draftee by writ of habeas corpus. The courts have uniformly held that such a writ may not issue unless there has been arbitrary action by the board, or unless it appears on the face of the record that the board was without jurisdiction.

The District Court for the Eastern District of New York has held that, under the Act of 1940, a determination of a question of fact by the local board is final and that it is within the province of the court not to review the evidence before the board, but only to determine whether there was substantial evidence before the board to support its findings. United States ex rel. Errichetti v. Baird, D.C., 39 F.Supp. 388.

The same court concluded that the action of local boards within the scope of their authority is final and not subject to judicial review, unless the board has acted contrary to law or has manifestly abused the discretion committed to it by the Act, saying: "Statements made by selective service registrants or selectees should be entirely accurate, and registrants or selectees should be held to strict accountability for each statement made." United States ex rel. Pasciuto v. Baird, D.C., 39 F.Supp. 411.

One draftee attempted to review the action of his local board denying a request for deferred classification. The court held it had no jurisdiction to review the action, saying the board was performing "purely an administrative act" within the scope of its power, and not a "judicial function." Petition of Soberman, D.C., 37 F.Supp. 522, 524.

In Shimola v. Local Board, D.C., 40 F. Supp. 808, 810, the court observed: "Counsel for petitioner cites cases which hold that courts will protect civil rights against arbitrary action by executive authorities. Such cases refer to such arbitrary conduct as 'abuse of discretion', 'fraudulent or capricious conduct', 'ultra vires acts,' etc. No doubt there are many remedies, such as injunction, quo warranto, habeas corpus with writ of certiorari, available to prevent unwarranted conduct by public officers. But courts will not substitute their judgment for the judgment of administrative officers exercised within the grant of their authority. Generally what is within the jurisdiction of the administrative agency is beyond the jurisdiction of the courts; it is only when acts are clearly beyond the grant of administrative authority that they come within the judicial authority. * * * Since the Boards acted within their grant of authority, this court, in the absence of specific authority to do so, cannot review the action of the Boards."

In Arver v. United States, 245 U.S. 366, 38 S.Ct. 159, 165, 62 L.Ed. 349, L.R.A. 1918C, 361, Ann.Cas. 1918B, 856, commonly known as the Selective Draft Law cases, the Act of 1917 was held constitutional in this language: "We think that the contention that the statute is void because vesting administrative officers with legislative discretion has been so completely adversely settled as to require reference only to some of the decided cases. [Citing a number of cases] A like conclusion also

adversely disposes of a similar claim concerning the conferring of judicial power. [Citing other cases] And we pass without anything but statement of the proposition that an establishment of a religion or an interference with the free exercise thereof repugnant to the First Amendment resulted from the exemption clauses of the act to which we at the outset referred because we think its unsoundness is too apparent to require us to do more."

█ In United States v. Tishman, 99 F. 2d 951, 953, decided by the Circuit Court of Appeals for the Seventh Circuit, the court restated the general proposition that a violation of an administrative rule or regulation made pursuant to and within the scope of a legislative act may be made a criminal offense. Judge Treanor, writer of the opinion, said that the regulations made by an administrative board which have been violated in that case came well "within the well recognized rule that a violation of administrative rule or regulation made pursuant to and within the scope of a legislative act may be made by the act a criminal offense." And he added that "the conferring of administrative authority upon administrative officers accompanied by general limitations and conditions upon its exercise is not a delegation of legislative power but an exercise of it. The power conferred in the instant case is to make decisions or 'to determine some fact or state of things upon which the law makes, or intends to make, its own action depend.'"

He quoted from United States v. Grimaud, 220 U.S. 506, 31 S.Ct. 480, 483, 55 L. Ed. 563: "From the beginning of the government, various acts have been passed conferring upon executive officers power to make rules and regulations,—not for the government of their departments, but for administering the laws which did govern. None of these statutes could confer legislative power. But when Congress had legislated and indicated its will, it could give to those who were to act under such general provisions 'power to fill up the details' by the establishment of administrative rules and regulations, the violation of which could be punished by fine or imprisonment fixed by Congress, or by penalties fixed by Congress, or measured by the injury done."

He also quoted from Field v. Clark, 143 U.S. 649, 12 S.Ct. 495, 505, 36 L.Ed. 294: "The legislature cannot delegate its power to make a law, but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend. To deny this would be to stop the wheels of government. There are many things upon which wise and useful legislation must depend which cannot be known to the law-making power, and must therefore be a subject of inquiry and determination outside of the halls of legislation." The Court of Appeals in that case affirmed a conviction for violation of a regulation of an administrative board, adopted pursuant to an Act of Congress. The decision, of course, is a precedent binding in this jurisdiction.

In Campbell v. Chase National Bank, D.C., 5 F.Supp. 156, 173, defendant was charged with violation of a regulation which forbade the hoarding of gold. There, Congress had, as it has here, appointed the President to "carry out that policy [of the legislation] by making such rules and regulations, by means of licenses or otherwise, as he might deem appropriate to the particular situation which he found facing the government in the emergency. * * * 'An administrative body may be invested with the power to ascertain the facts and conditions to which the policy and principles apply.'" The conviction in that case was affirmed.

██ With those principles in mind, we approach the decision here. Each of the defendants is charged with violation of the statute in that he failed to comply with the order of the draft board, an administrative body, the decision of which, after appeal, and after exhausting all right to a final appeal to the President, becomes final, a piece of legislation such as the Supreme Court, in the Selective Draft cases, held constitutional. It seems to me that the same principles that control in applications for writs of habeas corpus, or in other classes of litigation which have been instituted to test the validity of orders of draft boards, must apply in determining what may be shown in a defense to a criminal charge. Upon principle, it would seem that the defendant should be permitted to raise as a defense only the same questions that he could present in a habeas corpus proceeding, that is, the question of whether the board had jurisdiction, whether there was a fair hearing, or whether the action taken was arbitrary or unlawful. He should not be permitted to relitigate the

questions of fact that were within the scope of the board's jurisdiction, for the reason that the courts have consistently held that decisions of the board on questions of fact are conclusive and not subject to review by the courts, and because of the explicit language of the act conferring power on the board to hear and determine all questions or claims with respect to inclusion for, or for exemption or deferment from, training and service and making the decision of the board final, except on appeal.

It is appropriate that the government throw every essential safeguard about those who may be subject to military service, and an examination of the decisions reveals that such has been its policy from the earliest history of the nation to the present time. Its treatment of the manpower within its jurisdiction has been exceedingly generous, when it is remembered that Congress, under the Constitution, Art. 1, § 8, cl. 12, has plenary and exclusive power "to raise and support Armies," that this power is not limited to accepting voluntary enlistments but includes the power to exact and enforce military duty, and that Congress can determine how the army shall be raised, the period of service, the age at which the soldier shall be inducted, the compensation he may receive and the service to which he shall be assigned. Tarble's Case, 13 Wall. 397, 20 L.Ed. 597. This is an inherent power, coextensive with the power to declare war and to maintain the sovereignty of the nation. It is a fundamental principle of national law as transcendent as the right of self-preservation.

Bearing in mind the pertinent principles and remembering that there is no constitutional protection to the conscientious objector but that such protection as he has comes by grace of Congress and arises out of the demonstrated liberal policy of the American government, in this situation, where it appears that the defendants were before the boards, that their evidence was heard, that appeals were perfected and heard and that appeals to the President were futile, I can only conclude that the defendants are guilty of the crime charged against them. I have no right to review the findings of fact of the boards. They had before them evidence upon which they might and did act and their findings are as binding upon me as upon the defendants. I must give due heed to that fact, and would be guilty of a dereliction of my oath of office if I did not follow the behests of Congress, as interpreted by the Supreme Court of the United States. There will be a finding of guilty in each case.