## UNITED STATES ex rel. WEIDMAN
v.
### SWEENEY.
### No. M–1595.

United States District Court
E. D. Pennsylvania.

Dec. 30, 1953.

Thomas A. Masterson and John Rogers Carroll, Philadelphia, Pa., for petitioner.

W. Wilson White, U. S. Atty., Norman Kron, Asst. U. S. Atty., Philadelphia, Pa., for respondent.

CLARY, District Judge.

On September 21, 1953, petitioner William H. Weidman was apprehended by Agents of the Federal Bureau of Investigation at the Engineering Works Division Dravo Corporation, Neville Island, Pa., charged with desertion from the United States Marine Corps. He was delivered to the United States Army Military Police on the same day and later transferred on October 1, 1953, to the custody of Captain John D. Sweeney, USN Commanding Officer, U. S. Naval Receiving Station, Philadelphia, Pennsylvania. Charges were preferred against him, the basis being violation of the Uniform Code of Military Justice, Article 85. On October 21, 1953, prior to military trial on said charges, a petition for Writ of Habeas Corpus was filed in this Court by Weidman, charging unlawful detention and averring that he is not now and never has been a member of the United States Marine Corps and that his alleged induction into service in the Marine Corps was in violation of existing law.

Weidman registered for Selective Service in September, 1948 with Local Draft Board No. 29, Cleveland Heights, Ohio. On February 15, 1951 he was classified 1–A–O (Conscientious Objector) by that Board. On October 11, 1951 he was ordered to report for induction and complied. At the Induction Station petitioner was one of a group of eight out of a total group of approximately one hundred prospective inductees assigned arbitrarily to the United States Marine Corps. It is admitted that he was asked at the Draft Board whether he had any preference as to the branch of service and that his answer was "none". His explanation of that answer, which is convincing to the Court, is that since he was a Conscientious Objector he did not want to voluntarily join any branch of service. Petitioner at the time had been informed by his Draft Board that he would be assigned to noncombatant service. Knowing generally that the Marine Corps was somewhat different in its composition from the Army and the Navy, he brought to the attention of the Sergeant in Charge and later the Officer then in charge of the Marine Recruiting Station the fact that he was a Conscientious Objector and would not serve in any combatant unit. After making that statement he took the oath of induction voluntarily.

His service in the Marine Corps from the date of the alleged induction to the time he, without permission, voluntarily absented himself from the Marine Corps was as follows: He reported to Parris Island, South Carolina, and was assigned to a regular training platoon, scheduled

for full weapons training. He immediately protested and within a few days was transferred to a casual company on Parris Island where he did little work awaiting administrative action. Toward the end of October, at the request of his superiors, he made a statement that he was a Conscientious Objector, would not handle weapons, and would not serve in a combat unit. Thereafter he was transferred to a training platoon composed of a small number of Conscientious Objectors, which platoon was trained for approximately six weeks in marching, drill, sanitation and hygiene. It was during this period that he learned for the first time that (a) the Marines had no noncombatant unit and (b) that the Marines had no medical corps. He learned this verbally from his companions since to them it was a matter of common knowledge. After finishing his six weeks of training, he was given a 10 day leave with orders to report to Cherry Point, North Carolina. Upon his return there he was assigned to a combat air unit, the Second Marine Air Wing. He worked in the Headquarters Squadron Office of that unit for a period of about seven weeks from early in January until the end of February. In January he wrote a letter to Captain Egan, Personnel Officer of Headquarters Squadron, and asked for either inter-service transfer to the Army or discharge from the Marine Corps. He was informed by Captain Egan that the matter could not be processed since it was not in proper form. He was also told inter-service transfer could not be accomplished. He rewrote the letter on the 7th of February, at the suggestion of his superiors, asking for discharge at the convenience of the Government. He was asked again on the 29th day of February to rewrite the letter, which he did, requesting either discharge or inter-service transfer, and it was endorsed with the recommendation of approval by his superior and forwarded to the Commandant of the Marine Corps in Washington. On the same day he was transferred from Cherry Point, North Caro-

lina, to Miami, Florida, and assigned to the Marine Corps Air Station in that city. His duties there consisted of buying liquor for the Officers' Club, bartending, and the distribution of mail. He was still attached to a combat unit. The answer to his request for discharge at the convenience of the Government was contained in an Order issued by the Commandant of the Marine Corps, dated April 8, 1952, and reported to him in May of 1952, disapproving his request for discharge and duty assignment, rejecting the grounds advanced for such discharge, and authorizing appropriate disciplinary action in the event of "further refusal of duty" or "refusal to obey orders". It is significant that up until the time of the Order of the Commandant and the transmittal of the knowledge of its contents to the petitioner no complaint had ever been made of "refusal to obey orders" or "further refusal of duty".

Thereafter, and on May 6, 1952, he addressed a letter of protest to the Committee on Armed Services, House of Representatives, Washington, D. C., alleging that his retention in the Marine Corps was in violation of the regulations of the Secretary of Defense. Within a reasonably short time thereafter he received a reply from the Chairman of the Committee rejecting his protest. Upon receiving leave during the early part of July, he left and did not return to duty with the Marine Corps. He was apprehended as a deserter, as above related, some fourteen months later.

The above constitutes the facts as found by the Court from the testimony and exhibits introduced at the hearing.

Section 456(j) of Title 50 U.S.C.A. Appendix, protects Conscientious Objectors from combatant training and service in the Armed Forces of the United States. Executive Order No. 10028 of January 13, 1949, 14 F.R. 211, U.S.Code Cong. Service 1949, p. 2680, defines noncombatant service and noncombatant training pursuant to the aforesaid provisions of the statute as follows:

"1. The term 'noncombatant service' shall mean (a) service in any unit of the armed forces which is unarmed at all times; (b) service in the medical department of any of the armed forces, wherever performed; or (c) any other assignment the primary function of which does not require the use of arms in combat; provided that such other assignment is acceptable to the individual concerned and does not require him to bear arms or to be trained in their use.

"2. The term 'noncombatant training' shall mean any training which is not concerned with the study, use, or handling of arms or weapons."

The question of service of Conscientious Objectors in the Marine Corps was the subject of an order from the Commandant of the Marine Corps distributed to Commanding Officers entitled "CMC Letter AO–1–mlw, 4 Dec. 1951". That order listed the above regulations and stated categorically that subsections (a) and (b) are inapplicable, since those types of services do not exist within the Marine Corps, and that 1–A–O inductees (Conscientious Objectors) *must* be assigned in accordance with subsection (c). For policy reasons the communication was restricted and, while exhibited to the Court at the time of the hearing, was not offered in evidence. The above provisions, however, are clearly contained in the order.

The contention of the petitioner is that in violation of the Selective Service Law and Regulations thereunder he has been assigned to a military service which (a) has no unit unarmed at all times, (b) has no medical department in which he may serve, and (c) that no assignment has been offered him which is acceptable to him since all of his work has been in units assigned to combat training. He alleges, therefore, the invalidity of his purported induction. On the other hand, the Government contends (a) that having admittedly taken the oath voluntarily, he became subject to military law and is still subject to military law, (b) that by his subsequent conduct he waived any defects of induction, if any there were, (c) that since he is a well educated young man having a degree in mechanical engineering, he cannot plead ignorance of his legal rights, is guilty of laches and, therefore, estopped from setting up any alleged defect in the induction process, and finally that the second clause of paragraph (c) should be read in the disjunctive and that the Court should interpret "and" in that clause as "or".

 The only purpose of a writ of habeas corpus is to test the legality of the detention of a petitioner, In re Tarble, 13 Wall. 397, 80 U.S. 397, 20 L. Ed. 597; U. S. ex rel. Goodman v. Hearn, 5 Cir., 153 F.2d 186, certiorari dismissed, 329 U.S. 667, 67 S.Ct. 24, 91 L.Ed. 589. The crux of this case rests in a determination of the validity of the induction process at Cleveland, Ohio, on October 11, 1951. If Weidman was validly inducted, the application must be discharged. If not, he is entitled to release. A review of the many cases involving petitions for a writ of habeas corpus under the Selective Service Laws reveals no uniform rule of law applicable generally to this type of case. Each court clearly restricts the application of principles there enunciated to the peculiar facts of the individual case. Nearly every case involved a question of the propriety of the petitioner's Selective Service classification or raised a question whether in arriving at petitioner's classification the Draft Board had accorded the petitioner due process of law. No such question is involved here, as petitioner admits that he received a correct classification and that he was not denied due process of law by his Local Draft Board in its classification processes. The record clearly discloses that up until the day he reported for induction, pursuant to written order of the Draft Board, he had no complaint of any kind. The decision in this case must rest on an interpretation of the occurrences surrounding the alleged in-

duction and respecting the activities of (1) the Draft Board and (2) the Sergeant of Marines and Marine Recruiting Officer at the Marine Recruiting Station in Cleveland, Ohio.

While the record is rather barren of details as to what happened at the induction center on the morning of October 11, 1951, it is clear that the petitioner here was told by the Draft Board that he would be assigned to a noncombatant unit. The testimony of the petitioner, which the Court accepts as true since there is no contravening evidence, is that he did not know the composition of the Marine Corps to which he was arbitrarily assigned. Having general knowledge that the Marine Corps differed in some respects from the other armed services but not knowing in what detail and to what extent, petitioner here made clear to both the Sergeant and the Recruiting Officer in charge of the Marine Recruiting Station his position. At that time and under the law and regulations Weidman could have been arbitrarily assigned and could not have questioned an assignment to a unit unarmed at all times or he could have been arbitrarily assigned for service in the medical department of any of the armed forces, which assignment he could not have questioned. Finally, he could have been assigned to any duty and any service, the primary function of which would not require the use of arms in combat but provided that such assignment was (a) acceptable to the petitioner and (b) did not require him to bear arms or to be trained in their use. After making clear his position to the Recruiting Officer he took the oath of induction. At best, I can only conclude that the taking of this oath was provisional. Weidman did not know and had no way of knowing at that time that the Marine Corps had no unit unarmed at all times or that the Marine Corps had no medical department. He was entitled, therefore, under Executive Order No. 10028 to a choice, an assignment acceptable to him. He never had such a choice and has not had it to this day.

The record of his actions in the Marine Corps clearly demonstrates that respectfully but firmly he sought at all times only the rights accorded him by law and regulations and only after he had exhausted completely and finally all administrative remedies did he take the final step of voluntarily quitting the service which resulted in his being classified on Marine Corps records as a deserter.

■ I am very mindful of the serious problem involved in this case. Certainly no member of the armed services, whether a Conscientious Objector or not, should be permitted to enter the service, apparently without any objection, and then at a later date by voluntary unilateral action on his part separate himself from the service. Administrative confusion at best and perhaps danger to the security of the country might well follow if such a freedom of choice were available to individual members of the armed forces. "The idea that a soldier's tenure in the service may be terminated by him at will, or that a selectee may enter the army [or Marine Corps] on a trial basis and stay if he likes it or leave if he does not, is wholly foreign to the military concept in time of war, and diametrically opposed to the necessary policy of any sovereign." Mayborn v. Heflebower, 5 Cir., 145 F.2d, 864, 866. "* * * (He) can not become a quasi soldier by obeying such orders as his conscience approves and disobeying those to which he objects. The army [or Marine Corps] can not operate efficiently if its members are each to decide for himself what he will do." U. S. ex rel. Seldner v. Mellis, D.C., 59 F.Suppp. 682, 684.

■ It is therefore apparent that a 1–A–O inductee must, if he is to assure himself of being heard and is to conform to acceptable administrative procedure, exercise his acceptance or refusal of Marine Corps duty granted him by Executive Order No. 10028 before he is inducted. His choice cannot be intelligently made and the right to choose is of little value, if the prospective in-

ductee has no real knowledge of the subject matter of his choice. At the time the registrant reports to the induction center and until he is inducted, he is under the jurisdiction of the civil authorities, Billings v. Truesdell, 321 U.S. 542, 64 S.Ct. 737, 88 L.Ed. 917, but under the control of the military induction personnel, Curia v. Pillsbury, D.C., 54 F.Supp. 196, 200. It is not necessary to here decide whether the burden of informing the registrant of the nature of available Marine Corps duty should fall on the Selective Service officials or the military personnel in charge of inductions but it is clear that the registrant should have such pre-induction information and it would be unreasonable to require that he must himself search it out when well-informed officers are present to supply it to him. It therefore follows, taking into consideration all of the facts of this case, that Weidman's induction was in violation of the Selective Service Statutes and Regulations promulgated thereunder and, therefore, void.

Nor do I believe that by his subsequent conduct in the Marine Corps, Weidman waived the defects inherent in his induction. It was argued at the hearing on the part of the Government that by failing to take legal action to test his status and by taking unauthorized leave he in effect submitted himself to the military jurisdiction. It must be admitted that the proper manner to test a Selective Service classification is to bring a writ of habeas corpus action upon induction, Falbo v. U. S., 320 U.S. 549, 64 S.Ct. 346, 88 L. Ed. 305, and that this application should be made immediately, U. S. ex rel. Seldner v. Mellis, supra. Weidman, however, was not contesting his classification and so far as his knowledge of the Marine Corps permitted he could reasonably assume during the period after the induction ceremony and until sometime during the training period at Parris Island that the Marine Corps would comply with the law and could and would offer duty "acceptable" to him. He at no time offered or promised to undertake Marine activities inconsistent with his beliefs. Wearing the uniform and accepting pay are not per se waivers of irregularities in induction, Cox v. Wedemeyer, 9 Cir., 192 F.2d 920. Nor does the taking of unauthorized leave and the subsequent passage of a long period of time before apprehension on charges of desertion cut the petitioner off from the remedy of habeas corpus, Cox v. Wedemeyer, supra. In the Cox case, the petitioner was inducted on June 12, 1942. A short time thereafter he deserted and was arrested as a deserter in May of 1949. The Circuit Court of Appeals for the Ninth Circuit held that he was wrongfully inducted into the armed forces and that even though seven years had expired he was still entitled to relief by way of habeas corpus to secure release from imprisonment by army authorities under the charge of desertion. Nor do I think that Weidman was guilty of laches in failing to take prompt steps to test legally his status in the Marine Corps. To sustain this contention would penalize the petitioner for protesting in an orderly fashion to those officers who had him under their control and for assuming that an administrative error would be corrected upon its being pointed out to those with authority to act. He was insistent, unwavering, and consistent in presenting his objections and the only criticism that respondent has leveled at him is that, while he was serving, he was helpful and cooperative in attempting to resolve an administrative miscarriage rather than wholly obdurate and obstructive. His actions up until the time that all administrative channels of assistance appeared to be closed to him indicated no more than a willingness to yield a reasonable degree in his convictions in the interest of saving annoyance and embarrassment to those whose duty it was to deal with him. The refusal to bear arms and his protest against service in a unit whose members bore arms was at no time abandoned and the fact that he did not think it necessary to his release that he commit some act to cause his arrest

should not operate against his access to what then certainly would have been a proper legal remedy. The steadfastness of Weidman's resolve not to compromise his initially held principles is demonstrated by the prompt measure of self-help he undertook when the House Armed Services Committee closed what to his understanding was the last available avenue of relief. His conduct, therefore, while under control of the Marine Corps cannot be construed as a waiver of a defective induction and the subsequent illegal retention in the Corps.

■ Section 454(a) of Title 50 U.S. C.A.Appendix places legislative limitations on the power to induct. First, the inductee must be acceptable in all respects to the service concerned. This obviously means more than that the particular service be willing to take charge of his person. The inference to be drawn from the minimal standards expressly set forth in the Act is "acceptability" in all respects. The individual must be capable of performance of a certain standard sufficient to make him a useful and utilizable asset to the inducting service. It can hardly be contended on the basis of respondent's admissions that an individual who it is known will refuse to bear arms or serve in a unit whose members bear arms would be of any value or in the least degree "acceptable" to the Marine Corps. A further statutory limitation in Section 454, supra, provides that no person, without his consent, shall be inducted for training and service in the Armed Forces after he has attained the twenty-sixth anniversary of the day of his birth. A necessary element, therefore, of a valid induction of one over twenty-six years of age is his consent, and in its absence such induction would be void. It can be seen, therefore, that the securing of consent to induction is not foreign or repugnant to the Selective Service statutory plan.

■ The respondent further argues that the proviso concluding paragraph (1) of Executive Order No. 10028 should be read so that the conjunctive "and" shall also be taken to mean "or" with the result that if the 1–A–O inductee is offered duty which "does not require him to bear arms or be trained in their use" (admittedly this was all that was required of Weidman) then such duty need not be "acceptable" to him. Cited in support of this contention are the cases U. S. v. Fisk, 3 Wall. 445, 70 U.S. 445, 18 L.Ed. 243; Kerlin's Lessee v. Bull, 1 Dall. 175, 1 U.S. 175, 178, 1 L.Ed. 88, 89; and Travelers Insurance Co. v. Norton, D.C., 24 F.Supp. 243, 246. These decisions are of no aid to respondent for they hold simply that a statutory "and" shall be construed to read "or" (or to the contrary as in Travelers) where such construction is necessary to carry out the legislative intent or to prevent a result plainly at odds with the purpose of the statute. It is inconceivable that Executive Order No. 10028, which has the force and effect of, and is in direct implementation of the statute, in paragraph (1), subsection (a) would require only that a 1–A–O registrant serve "in any unit of the armed forces which is unarmed at all times", and in subsection (c) take away this prerogative by allowing him, at the option of the service concerned, to be commanded to serve so long as the duty "does not require him to bear arms or to be trained in their use." Respondent attempts to maintain inconsistent positions, admitting on one hand that there is no duty available in the Marine Corps permissible under subsection (a) and on the other hand arguing that it may require service under subsection (c) which is by plain implication proscribed by the former subsection. To so construe the order makes the element of "acceptability" nugatory and the inclusion of subsection (a) a futile act. Such construction would serve no discernible statutory purpose and frustrate an obvious intent to require service alongside armed men, except in a medical unit, only if the 1–A–O registrant voluntarily assumes this closer association with combat functions.

■ In reaching a determination that the petitioner is entitled to be discharged from military imprisonment, I do not intend to indicate that he has satisfied his obligations to the military. He still remains subject to the Selective Service Act and can be made to serve in accordance with law and regulations. Pending a determination by the United States Attorney as to whether he desires to appeal from this decision and during the interval allowed by statute for appeal, pursuant to the provisions of Rule 15(3) of the Rules of the United States Court of Appeals for the Third Circuit, the petitioner will be released upon recognizance with surety in the sum of Two Thousand ($2,000.00) Dollars to be approved by the Clerk of this Court; said recognizance to continue in force and effect in the event of an appeal from this decision for petitioner's appearance to answer and abide by the judgment in the appellate proceedings.