IN THE SUPREME COURT OF NORTH CAROLINA

No. 437PA18

Filed 5 June 2020

CARLOS CHAVEZ and LUIS LOPEZ, Petitioners,

v.

GARY McFADDEN, SHERIFF, MECKLENBURG COUNTY, Respondent.

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 262 N.C. App. 196, 822 S.E.2d 121 (2018), vacating and remanding orders entered on 13 October 2017 by Judge Yvonne Mims Evans in Superior Court, Mecklenburg County. Heard in the Supreme Court on 4 November 2019.

*Goodman Carr, PLLC, by Rob Heroy, and Sejal Zota, for petitioners-appellants*

*Womble Bond Dickinson (US) LLP, by Sean F. Perrin, for respondent-appellee*

*Deborah M. Weissman, for Law Scholars and National Immigrant Justice Center, amici curiae*

*Raul A. Pinto, for North Carolina Justice Center, amicus curiae*

*Irena Como, Katrina Braun, Omar Jadwat, Cody Wofsy, Daniel Galindo, and Spencer Amdur, for American Civil Liberties Union Foundation (ACLU) and ACLU of North Carolina, et al., amici curiae*

*Joshua S. Press, for United States Department of Justice, amicus curiae*

ERVIN, Justice.

The question before us in this case is whether state judicial officials acting in counties in which the Sheriff has entered into a 287(g) agreement with the federal government have the authority to grant applications for the issuance of writs of habeas corpus for and to order the release of individuals held pursuant to immigration-related arrest warrants and detainers. After a thorough review of the record, briefs, and arguments made by the parties, we conclude that the trial court erred by ordering the release of petitioners Carlos Chavez and Luis Lopez because the record establishes that petitioners were held under a claim of federal authority that the trial court was required to respect. In light of that and other determinations, we modify and affirm the decision of the Court of Appeals, in part; reverse that decision, in part; vacate that decision, in part; and remand this case to the Court of Appeals with instructions that this case be remanded to the Superior Court, Mecklenburg County, with instructions to deny petitioners' requests for the issuance of writs of habeas corpus and to be discharged from custody.

On 28 February 2017, then-Sheriff of Mecklenburg County, Irwin Carmichael, entered into a written agreement with the United States Immigration and Customs Enforcement, an entity housed within the Department of Homeland Security, pursuant to § 287(g) of the Immigration and Nationality Act, codified at 8 U.S.C. § 1357(g) (1996), as amended by the Homeland Security Act of 2002, Public Law 107-296. In accordance with the provisions of this agreement, certified Mecklenburg County deputies, subject to the direction and supervision of the Attorney General of

the United States, were authorized to perform specific immigration enforcement functions, including, among others, the investigation, apprehension, and detention of undocumented aliens "to the extent consistent with State and local law." 8 U.S.C. § 1357(g)(1)–(3), (5) (2018).

On 5 June 2017, petitioner Lopez was being held in pretrial detention in the Mecklenburg County Jail based upon common law robbery, conspiracy, resisting a public officer, and misdemeanor breaking or entering charges. On 5 July 2017, the District Attorney's office voluntarily dismissed the common law robbery, conspiracy, and resisting a public officer charges on the grounds of insufficient evidence. At that point, petitioner Lopez remained subject to a $400.00 secured bond in connection with the misdemeanor breaking or entering charge, which was the only charge that was still pending against him. On 13 August 2017, petitioner Chavez was arrested and placed in pretrial detention in the Mecklenburg County Jail subject to a $100.00 cash bond for driving while impaired, driving without an operator's license, interfering with emergency communications, and assault on a female. At approximately 9:00 a.m. on 13 October 2017, both petitioners became eligible for release when petitioner Lopez's $400.00 bond was modified from a secured to an unsecured bond and someone posted petitioner Chavez's $100.00 bond. Even so, the Sheriff continued to hold both

petitioners in the Mecklenburg County Jail pursuant to immigration-related arrest warrants and detainers.[1]

On the morning of 13 October 2017, an investigator employed by the Public Defender's Office sent an e-mail to the Sheriff's General Counsel bearing the subject line "Heads up-Important" for the purpose of informing the General Counsel that emergency writs of habeas corpus relating to petitioners would be submitted later that day. At 9:12 a.m., both petitioners filed petitions seeking the issuance of a writ of habeas corpus based upon assertions that their continued detention in the Mecklenburg County Jail was unlawful because: (1) "the detainer[s] lack[ed] probable cause, [were] not [ ] warrant[s], and ha[d] not been reviewed by a judicial official" in violation of the Fourth Amendment to the United States Constitution; (2) the Sheriff "lack[ed] authority under North Carolina General Statutes to continue to detain [p]etitioner[s] after all warrants and sentences ha[d] been served"; and (3) the Sheriff's "honoring of ICE's request[s] for detention violate[d] the anti-commandeering principles of the Tenth Amendment."

---

[1] A Form I-200, which is entitled "Warrant of Arrest," is an administrative arrest warrant issued against aliens for civil immigration violations by an authorized immigration officer. 8 C.F.R. § 236.1(b)(1) (2019); *see also* 8 U.S.C. § 1226 (2018). A Form I-247A is an "Immigration Detainer-Notice of Action" that "serves to advise another law enforcement agency that [DHS] seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien," and "request[s] that such agency advise [DHS], prior to release of the alien, in order for [DHS] to arrange to assume custody, in situations when gaining immediate physical custody is either impracticable or impossible." 8 C.F.R. § 287.7(a) (2019). As a general proposition, the detaining "agency shall maintain custody of the alien for a period not to exceed 48 hours." *Id.* § 287.7(d).

At 9:30 a.m., the General Counsel forwarded the investigator's e-mail to Sheriff Carmichael; Sean Perrin, the Sheriff's outside legal counsel; Donald Belk, a captain serving in the Mecklenburg County Jail; and eight other individuals in which the General Counsel stated that "I do not acknowledge receipt of [the investigator's] emails on this topic." At 9:37 a.m., Captain Belk responded to the General Counsel's e-mail by indicating that the office of the Clerk of Superior Court of Mecklenburg County had advised him that the cases "are on in [Courtroom] 5350 this morning," that petitioner Lopez remained in the Sheriff's custody, and that, since petitioner Chavez had already been turned over to ICE, he "should not go to court."

On the same morning, the trial court issued writs of habeas corpus ordering that petitioners be "immediately brought before a judge . . . to determine the legality of [their] confinement" and requiring the Sheriff to "immediately appear and file a return." Following the issuance of the trial court's order, the investigator attempted to serve it at the Sheriff's office. After the front desk employee at the Sheriff's Office refused to accept service, the investigator left the trial court's orders at the front desk. In addition, the investigator served copies of the trial court's orders upon the personnel working at Mecklenburg County jail, the Sheriff's outside legal counsel, the office of ICE's Chief Counsel, and an assistant district attorney.

At 11:57 a.m., a further hearing was held before the trial court at which the Sheriff did not appear, either in person or through counsel. In addition, the Sheriff did not file a return or produce either petitioner before the trial court. At 12:08 p.m.,

the trial court entered orders finding that both petitioners were being unlawfully detained and ordering that they be discharged from the Sheriff's custody.

At 2:58 p.m., the Sheriff filed written returns relating to both petitioners. The return filed with respect to petitioner Chavez stated that, while he was being held in "exclusive" federal custody, he was physically incarcerated in the Mecklenburg County Jail. The return filed with respect to petitioner Lopez stated that, "[a]t the time of the [p]etitioner's filing," he was being held in state custody and detained in the Mecklenburg County Jail pursuant to a $400.00 secured bond for misdemeanor breaking or entering and an arrest warrant and detainer that had been issued by DHS. The Sheriff declined to release either petitioner and eventually delivered them to ICE custody.

On 6 November 2017, the Sheriff filed petitions seeking the issuance of writs of certiorari with the Court of Appeals authorizing review of the trial court's orders and the issuance of a writ of prohibition to preclude the trial court from ruling upon any further habeas corpus petitions relating to the lawfulness of the continued detention of persons subject to immigration-related detainers or arrest warrants. On 22 December 2017, the Court of Appeals entered an order allowing the Sheriff's certiorari petitions and prohibiting "the trial court . . . from issuing a writ of habeas corpus ordering the release of a person detained by the Sheriff" pursuant to a 287(g) agreement and "from entering any orders or sanctions limiting the authority of the

Sheriff and his officers or agents, or any officer or agent of the United States, from carrying out the acts permitt[ed] by the agreement."

In seeking relief from the trial court's orders before the Court of Appeals, the Sheriff argued that the trial court lacked "jurisdiction to rule on federal immigration matters." In addition, the Sheriff contended that the trial court had erred by ordering that petitioners be released "because [they] were being exclusively detained on United States Department of Homeland Security detainers and administrative warrants." In response, petitioners contended that the Court of Appeals should dismiss the Sheriff's appeal on the grounds that the Sheriff had waived the right to assert the arguments that he was now seeking to make on appeal given that he had failed to raise them before the trial court and, in the alternative, because the case was moot. In attempting to persuade the Court of Appeals to uphold the challenged trial court orders, petitioners argued that the trial court had ample authority to rule upon the merits of their petitions because neither petitioner was being held in federal custody at the time that the relevant orders had been entered. More specifically, petitioners contended that: (1) the 287(g) agreement was not properly before the court; (2) neither federal nor state law authorized the Sheriff to detain petitioners for civil immigration purposes; (3) both petitioners remained in state custody when the trial court authorized their release; and (4) the record evidence failed to demonstrate that either petitioner was being lawfully held in DHS custody. Finally, petitioners argued that the Court of Appeals should dismiss the Sheriff's appeal because his

continued detention of petitioners violated their rights under North Carolina law and the state and federal constitutions.

On 6 November 2018, the Court of Appeals filed an opinion vacating the challenged trial court orders on the grounds that the trial court "lacked any legitimate basis and was without jurisdiction to review, consider, or issue writs of *habeas corpus* for alien [p]etitioners not in state custody and held under federal authority, or to issue any orders related thereon to the Sheriff." *Chavez v. Carmichael*, 262 N.C. App. 196, 216, 822 S.E.2d 131, 145 (2018). As an initial matter, the Court of Appeals determined that the Sheriff's appeal was not subject to dismissal for mootness on the grounds that this case was subject to the public interest exception to the mootness doctrine. *Id.* at 203–04, 822 S.E.2d at 137–38 (stating that "[t]he Sheriff's appeal presents significant issues of public interest because it involves the question of whether our state courts possess jurisdiction to review *habeas* petitions of alien detainees ostensibly held under the authority of the federal government"). According to the Court of Appeals, "[p]rompt resolution of this issue [wa]s essential because it is likely other *habeas* petitions will be filed in our state courts, which impacts ICE's ability to enforce federal immigration law." *Id.* at 204, 822 S.E.2d at 138.

The Court of Appeals concluded, in addressing the merits, that the trial court lacked subject matter jurisdiction to issue writs of habeas corpus in instances like this one. *Id.* at 206–09, 822 S.E.2d at 139–41. In reaching this conclusion, the Court of Appeals held that "North Carolina law does not forbid state and local law

enforcement officers from performing the functions of federal immigration officers" and that "the policy of North Carolina as enacted by the General Assembly, expressly authorizes sheriffs to enter into 287(g) agreements to permit them to perform such functions." *Id.* at 209, 822 S.E.2d at 140 (citing N.C.G.S. § 128-1.1 (2017)). In addition, the Court of Appeals held that the trial court lacked jurisdiction to issue writs of habeas corpus in these cases because "[a] state court's purported exercise of jurisdiction to review the validity of federal detainer requests and immigration warrants infringes upon the federal government's exclusive federal authority over immigration matters." *Id.* at 211, 822 S.E.2d at 142. The Court of Appeals also held that North Carolina courts lacked the authority to entertain petitions seeking the issuance of writs of habeas corpus applicable to individuals held in federal custody even if the relevant sheriff had not entered into a 287(g) agreement with ICE given that any such review of the lawfulness of immigration-related detentions "constitute[d] prohibited interference with the federal government's supremacy and exclusive control over matters of immigration." *Id.* at 211–12, 822 S.E.2d at 142. Finally, the Court of Appeals held that petitioners had the status of detainees being held in federal custody and that the trial court lacked jurisdiction to order their release because the Sheriff, in detaining petitioners, was acting under the actual authority of the United States granted to him pursuant to the 287(g) agreement, under color of federal authority arising from the warrants and detainer requests, and as a federal officer for purposes of the 287(g) agreement. *Id.* at 213–16, 822 S.E.2d

at 143–45. As a result, the Court of Appeals held that the trial court had been "without jurisdiction, or any other basis, to receive, review, or consider [p]etitioners' *habeas* petitions, other than to dismiss for want of jurisdiction, to hear or issue writs of *habeas corpus*, or intervene or interfere with [p]etitioner[s'] detention in any capacity," and remanded this case with instructions that petitioners' habeas corpus petitions be dismissed. *Id.* at 216–17, 822 S.E.2d at 145. On 27 March 2019, this Court allowed petitioners' petition seeking discretionary review of the Court of Appeals' decision.[2]

In seeking to convince us that the Court of Appeals erred by vacating the challenged trial court orders, petitioners argue that the Court of Appeals effectively "issued an advisory opinion in a moot case." More specifically, petitioners contend that, "[a]fter refusing to respond to the noticed-writ issued by the superior court, and handing [p]etitioners over to ICE custody for deportation in contravention of that court's release order, the sheriff appealed the very release order it had willfully mooted in an attempt to obtain an after-the-fact advisory opinion supporting its

---

[2] On 4 December 2018, Gary McFadden was sworn in as Sheriff of Mecklenburg County and terminated his office's 287(g) agreement with ICE on the following day. *See* Jane Webster, *New sheriff tells ICE he'll end controversial jail immigration program in Mecklenburg*, The Charlotte Observer (Dec. 5, 2018 11:11 AM), https://perma.cc/RY8K-MXUW. Sheriff McFadden is substituted for former Sheriff Carmichael as the named respondent in this case pursuant to N.C.R. App. P. 38(c) (stating that, "[w]hen a person is a party to an appeal in an official or representative capacity and during its pendency dies, resigns, or otherwise ceases to hold office, the action does not abate and the person's successor is automatically substituted as a party"). Sheriff McFadden did not oppose the allowance of petitioners' discretionary review petition.

conduct." According to petitioners, the Court of Appeals erred by holding that the public interest exception to the mootness doctrine applied in this case, with petitioners expressing the inability to "imagine worse-suited circumstances for application of the discretionary public-interest exception" given that "the public interest exception does not overrule the long-standing rule . . . that our state's appellate courts are not the proper forum for seeking advisory opinions." In addition, petitioners assert that the Court of Appeals erred by reaching the merits of the Sheriff's challenge to the relevant trial court orders on the grounds that "the sheriff did not preserve his arguments" and had "defaulted by willfully failing to appear and to present evidence in the trial court."

As far as the merits of this case are concerned, petitioners argue that the trial court "retained jurisdiction to determine if [p]etitioners were in lawful state custody, and correctly found no evidence of federal custody." According to petitioners, the trial court had "the jurisdiction to review a habeas petition to determine whether the individual is in lawful state custody," with the trial court having "correctly determined that [petitioners] were not in federal custody because the sheriff brought no evidence to support that claim." Finally, petitioners argue that "the Court of Appeals erred in concluding that the trial court lacked jurisdiction even if the 287(g) agreement was invalid" on the grounds that its decision to this effect "was unnecessary to its conclusions." In support of this assertion, petitioners contend that "the trial court had subject matter jurisdiction to review the habeas petitions under

state law" and that it "correctly determined that [p]etitioners were not in lawful state custody because state law does not authorize detainer arrests in the absence of a 287(g) agreement."

In seeking to convince this Court to uphold the Court of Appeals' decision in his favor, the Sheriff argues that the Court of Appeals "correctly addressed the merits of the case" on the grounds that "the public interest exception to mootness applies." In addition, the Sheriff contends that the exception to the mootness doctrine applicable to cases that are "capable of repetition, yet evading review," is applicable to this case as well. Moreover, the Sheriff argues that "the Court of Appeals' holding that a state trial court cannot rule on the legality of a federal immigration arrest warrant and detainer in the absence of a 287(g) agreement was dicta" given that both petitioners were detained pursuant to a 287(g) agreement. The Sheriff denies having waived the right to challenge the lawfulness of the trial court's orders on appeal given that any party can raise the issue of jurisdiction at any time and given that the Court of Appeals allowed the Sheriff's certiorari petitions.

In addressing the merits of petitioners' challenge to the Court of Appeals' decision, the Sheriff argues that "the trial court did not have subject matter jurisdiction to rule on the legality of administrative immigration arrest warrants and detainers." In the Sheriff's view, when local officers act pursuant to a 287(g) agreement, they are functioning "as federal immigration officials," with a state judicial official lacking any authority to "issue writs against federal officials." The

Sheriff contends that "the federal government has exclusive jurisdiction over immigration issues in both 287(g) jurisdictions and non 287(g) jurisdictions" and that, since individuals detained pursuant to immigration arrest warrants and detainers are being held in federal custody, "state habeas statutes cannot be used to undermine the federal government's exclusive jurisdiction over immigration issues."

As a general proposition, North Carolina appellate courts do not decide moot cases. *In re A.K.*, 360 N.C. 449, 452, 628 S.E.2d 753, 755 (2006) (stating that this Court will usually "decide a case only if the controversy which gave rise to the action continues at the time of appeal" (citing *In re Peoples,* 296 N.C. 109, 148, 250 S.E.2d 890, 912 (1978)). "A case is 'moot' when a determination is sought on a matter which, when rendered, cannot have any practical effect on the existing controversy." *Roberts v. Madison Cty. Realtors Ass'n*, 344 N.C. 394, 398–99, 474 S.E.2d 783, 787 (1996) (quoting *Moot Case, Black's Law Dictionary* (6th ed. 1990)); *see also Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307, 132 S. Ct. 2277, 2287, 183 L. Ed. 2d 281, 295 (stating that "[a] case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party" (cleaned up) (quoting *City of Erie v. Pap's A. M.*, 529 U.S. 277, 287, 120 S. Ct. 1382, 1390, 146 L. Ed. 2d 265, 277 (2000))). "In state courts the exclusion of moot questions from determination is not based on a lack of jurisdiction but rather represents a form of judicial restraint." *Cape Fear River Watch v. N.C. Envtl Mgmt. Comm'n*, 368 N.C. 92, 100, 772 S.E.2d 445, 450 (2015) (quoting *Peoples*, 296 N.C. at 147, 250 S.E.2d at 912). Our purpose

in exercising such restraint is to ensure that this Court does not "determine matters purely speculative, enter anticipatory judgments, declare social status, deal with theoretical problems, give advisory opinions, answer moot questions, adjudicate academic matters, provide for contingencies which may hereafter arise, or give abstract opinions." *Little v. Wachovia Bank & Tr. Co.*, 252 N.C. 229, 243, 113 S.E.2d 689, 700 (1960), *overruled on other grounds by Citizens Nat'l Bank v. Grandfather Home for Children, Inc.*, 280 N.C. 354, 185 S.E.2d 836 (1972). As a general proposition, cases that have become moot should be dismissed. *Benvenue Parent-Teacher Ass'n v. Nash Cty. Bd. of Educ.*, 275 N.C. 675, 679, 170 S.E.2d 473, 476 (1969).

The mootness doctrine is subject to exceptions, including the public interest exception, upon which the Court of Appeals relied, and the "capable of repetition, yet evading review" exception, to which the Sheriff has referred in his brief before this Court. According to the first of these two exceptions, "this court may, if it chooses, consider a question that involves a matter of public interest, is of general importance[,] and deserves prompt resolution." *Cape Fear*, 368 N.C. at 100, 772 S.E.2d at 450 (quoting *N.C. State Bar v. Randolph*, 325 N.C. 699, 701, 386 S.E.2d 185, 186 (1989) (per curiam)). A case is "capable of repetition, yet evading review," when the underlying conduct upon which the relevant claim rests is necessarily of such limited duration that the relevant claim cannot be fully litigated prior to its cessation and the same complaining party is likely to be subject to the same allegedly

unlawful action in the future. *Cooper v. Berger*, 370 N.C. 392, 421, 809 S.E.2d 98, 116 (2018) (citing *Shell Island Homeowners Ass'n v. Tomlinson*, 134 N.C. App. 286, 292, 517 S.E.2d 401, 405 (1999)).

As all parties have conceded, the fact that both petitioners have already been turned over to federal immigration authorities renders this case moot. However, we agree with the Court of Appeals that this case comes within the scope of the public interest exception to the mootness doctrine. There can be no question but that issues relating to both lawful and unlawful immigration have become the subject of much debate in North Carolina in recent years.[3] In addition, publicly available information provided by ICE indicates that it continues to maintain 287(g) agreements with six North Carolina law enforcement agencies.[4] As a result of the public interest

---

[3] The General Assembly has considered legislation addressing the issue of whether North Carolina sheriffs should be required to cooperate with immigration-related arrest warrants and detainers. *See* H.B. 370, An Act to Require Compliance with Immigration Detainers and Administrative Warrants, N.C. Gen. Assemb., 2019 Sess. (N.C. 2019), https://perma.cc/8PR3-SNH7. On 20 August 2019, the General Assembly ratified H.B. 370. *Id.* On the following day, however, Governor Roy Cooper vetoed that piece of legislation. *Governor Cooper Vetoes HB 370*, NC Governor Roy Cooper (Aug. 21, 2019), https://perma.cc/6SR9-H9Q8. In addition, news media reports reflect that a number of candidates for sheriff "in North Carolina's largest counties won election in 2018 after making high-profile promises not to work with federal immigration agents" by ending 287(g) agreements. Will Doran and Virginia Bridges, *Some NC sheriffs won't work with ICE. This GOP-backed bill would force them to*, The News & Observer (March 15, 2019, 5:16 PM), https://perma.cc/C8TB-SVSN.

[4] According to the ICE website, "[a]s of May 2020," the agency has 287(g) agreements with eight law enforcement agencies in North Carolina: Alamance County, Cabarrus County, Cleveland County, Gaston County, Henderson County, Nash County, Randolph County, and Rockingham County. *Delegation of Immigration Authority Section 287(g) Immigration and Nationality Act*, U.S. Immigration and Customs Enforcement, https://perma.cc/JQC3-SBFC (last updated May 27, 2020).

surrounding this issue and the fact that several law enforcement agencies across our State continue to operate pursuant to 287(g) agreements, we believe that the Court should reach the merits of the issues that are before us in this case given the likelihood that issues similar to those that have been debated by the parties to this case will continue to arise in the future. Moreover, while the "capable of repetition, yet evading review" exception to the mootness doctrine is technically not available in this case given the absence of any indication that petitioners are likely to find themselves in the same situation that they confronted in this case in the future, the fact that the same issues could arise in the future in jurisdictions that continue to be parties to 287(g) agreements with ICE provides additional support for our conclusion that the public interest exception to the mootness doctrine exists in this case. As a result, we will now proceed to address the merits of the substantive issues that are before us in this case.

The North Carolina Constitution provides that "[e]very person restrained of his liberty is entitled to a remedy to inquire into the lawfulness thereof, and to remove the restraint if unlawful, and that remedy shall not be denied or delayed," N.C. Const. art. I, § 21; *see also* N.C.G.S. § 17-1 (2019), with the "privilege of the writ of habeas corpus" not being subject to suspension. N.C. Const. art. I, § 21; *see also* N.C.G.S. § 17-2 (2019). "Every person imprisoned or restrained of his liberty within this State, for any criminal or supposed criminal matter, or on any pretense whatsoever . . . may prosecute a writ of habeas corpus." N.C.G.S. § 17-3 (2019). A petition seeking the

issuance of a writ of habeas corpus "is the proper method by which a prisoner may challenge his incarceration as being unlawful." *State v. Parks*, 290 N.C. 748, 751, 228 S.E.2d 248, 250 (1976) (citing *In re Burton*, 257 N.C. 534, 540, 126 S.E.2d 581, 586 (1962)).

An application for the issuance of a writ of habeas corpus, made by a party or any other person on that person's behalf, N.C.G.S. § 17-5 (2019), directed to any superior court or appellate judge in this State, *id.* § 17-6, must allege, among other things, that the party "is imprisoned or restrained of his liberty," the location of the party's imprisonment, the person restraining the imprisoned party, "[t]he cause or pretense of such imprisonment or restraint," and any supporting documents. *Id.* § 17-7(1)–(3). After a party applies for the writ, any judge empowered to do so "shall grant the writ without delay, unless it appear from the application itself or from the documents annexed that the person applying or for whose benefit it is intended is, by this Chapter, prohibited from prosecuting the writ." *Id.* § 17-9. If the judge issues the writ of habeas corpus, "[t]he person or officer on whom the writ is served must make a return thereto in writing," either immediately or within a certain period of time as designated by the judge, *id.* §§ 17-13, -14, stating whether the individual upon whom the writ is served "has or has not the party in his custody or under his power or restraint" and, if so, "the authority and the cause of such imprisonment or restraint" along with any documents supporting the imprisonment or restraint. *Id.* § 17-14(1)–(3). After the return has been made, the judge shall

> examine into the facts contained in such return, and into the cause of the confinement or restraint of such party, whether the same has been upon commitment for any criminal or supposed criminal matter or not; and if issue be taken upon the material facts in the return, or other facts are alleged to show that the imprisonment or detention is illegal, or that the party imprisoned is entitled to his discharge, the court or judge shall proceed, in a summary way, to hear the allegations and proofs on both sides, and to do what to justice appertains in delivering, bailing or remanding such party.

*Id.* § 17-32. A party petitioning for the issuance of a writ of habeas corpus shall be discharged "[i]f no legal cause is shown for such imprisonment or restraint, or for the continuance thereof." *Id.* § 17-33. Although no appeal as of right lies from an order entered in a habeas corpus proceeding, appellate review of such orders is available "by petition for certiorari addressed to the sound discretion of the appropriate appellate court." *State v. Niccum*, 293 N.C. 276, 278, 238 S.E.2d 141, 143 (1977) (citations omitted).

Any examination of the nature and extent of a state court's authority to entertain an application for the issuance of a writ of habeas corpus made by an individual detained by a local law enforcement agency pursuant to immigration-related arrest warrants and detainers necessarily involves recognition of the fact that federal law is entitled to take precedence over state law, particularly in the immigration arena. According to the Supreme Court of the United States, "[t]he Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens," *Arizona v. United States*, 567 U.S. 387, 394,

132 S. Ct. 2492, 2498, 183 L. Ed. 2d 351, 366 (2012) (citing *Toll v. Moreno*, 458 U.S. 1, 10, 102 S. Ct. 2977, 2982, 73 L. Ed. 2d 563, 571–72 (1982)), with this "broad, undoubted power" having its source in the constitutional provision authorizing Congress "[t]o establish [a] uniform Rule of Naturalization." U.S. Const. art. I, § 8, cl. 4. Acting in reliance upon this grant of authority, Congress has enacted "extensive and complex" legislation concerning immigration, *Arizona*, 567 U.S. at 395, 132 S. Ct. at 2499, 183 L. Ed. 2d at 366, with those laws constituting "the supreme Law of the Land," U.S. Const. art. VI, cl. 2, and having the effect of preempting state law. *Arizona*, 567 U.S. at 399, 132 S. Ct. at 2500, 183 L. Ed. 2d at 368 (citations omitted).

Just as a state cannot enact laws that interfere with "the preeminent role of the Federal Government with respect to the regulation of aliens within our borders," *Toll*, 458 U.S. at 10, 102 S. Ct. at 2982, 73 L. Ed. 2d at 571, state court judges cannot interfere with the custody and detention of individuals held pursuant to federal authority. The Supreme Court of the United States outlined the applicable principles over a century ago. On 10 August 1869, a court commissioner in Dane County, Wisconsin issued a writ of habeas corpus ordering the discharge of Edward Tarble, who was held in the custody of Lieutenant Stone, a recruiting officer for the United States Army, on the grounds that Mr. Tarble had attempted to enlist in the Army while under the age of eighteen and without the consent of his father. *Tarble's Case*, 80 U.S. 397, 397–98, 20 L. Ed. 597, 598 (1872). After ordering Lieutenant Stone to bring Mr. Tarble before him at once and to provide a justification for his detention,

*id.* at 398, 20 L. Ed. at 598, the commissioner, following a hearing, "held that the prisoner was illegally imprisoned and detained by Lieutenant Stone, and commanded that officer forthwith to discharge him from custody." *Id.* at 399, 20 L. Ed. at 598. Following a decision of the Wisconsin Supreme Court affirming the commissioner's discharge order, *id.* at 399–400, 20 L. Ed. at 598, the United States sought and obtained review by the Supreme Court, *id.* at 400, 20 L. Ed. at 598, which held that "no State can authorize one of its judges or courts to exercise judicial power, by *habeas corpus* or otherwise, within the jurisdiction of another and independent government," *id.* at 405, 20 L. Ed. at 600, and that, "although the State of Wisconsin is sovereign within its territorial limits to a certain extent, yet that sovereignty is limited and restricted by the Constitution of the United States." *Id.* at 405–06, 20 L. Ed. at 600. The Supreme Court further noted that, while the federal and state governments exercise their powers "within the same territorial limits," they "are yet separate and distinct sovereignties, acting separately and independently of each other, within their respective spheres." *Id.* at 406, 20 L. Ed. at 600. Although "[n]either government can intrude within the jurisdiction, or authorize any interference therein by its judicial officers with the action of the other," when any conflict arises between the two governments, federal law is "the supreme law of the land." *Id.* In light of these fundamental legal principles, the Supreme Court stated that;

> State judges and State courts, authorized by laws of
> their States to issue writs of *habeas corpus*, have
> undoubtedly a right to issue the writ in any case where a

party is alleged to be illegally confined within their limits, unless it appear upon his application that he is confined under the authority, or claim and color of the authority, of the United States, by an officer of that government. If such fact appear upon the application the writ should be refused. If it do not appear, the judge or court issuing the writ has a right to inquire into the cause of imprisonment, and ascertain by what authority the person is held within the limits of the State; and it is the duty of the marshal, or other officer having the custody of the prisoner, to give, by a proper return, information in this respect. His return should be sufficient, in its detail of facts, to show distinctly that the imprisonment is under the authority, or claim and color of the authority, of the United States, and to exclude the suspicion of imposition or oppression on his part. And the process or orders, under which the prisoner is held, should be produced with the return and submitted to inspection, in order that the court or judge issuing the writ may see that the prisoner is held by the officer, in good faith, under the authority, or claim and color of the authority, of the United States, and not under the mere preten[s]e of having such authority.

. . . But, after the return is made, and the State judge or court judicially apprised that the party is in custody under the authority of the United States, they can proceed no further. They then know that the prisoner is within the dominion and jurisdiction of another government, and that neither the writ of *habeas corpus* nor any other process issued under State authority can pass over the line of division between the two sovereignties. He is then within the dominion and exclusive jurisdiction of the United States. If he has committed an offence against their laws, their tribunals alone can punish him. If he is wrongfully imprisoned, their judicial tribunals can release him and afford him redress.

. . . [T]he State judge or State court should proceed no further when it appears, from the application of the party, or the return made, that the prisoner is held by an officer of the United States under what, in truth, purports to be

> the authority of the United States; that is, an authority, the validity of which is to be determined by the Constitution and laws of the United States. If a party thus held be illegally imprisoned it is for the courts or judicial officers of the United States, and those courts or officers alone, to grant him release.

*Id.* at 409–11, 20 L. Ed. at 601–02 (cleaned up). *See also Ex parte Royall*, 117 U.S. 241, 249, 6 S. Ct. 734, 739, 29 L. Ed. 868, 870–71 (1886) (stating that "the courts and judges of the several States . . . cannot, under any authority conferred by the States, discharge from custody persons held by authority of the courts of the United States, or of commissioners of such courts, or by officers of the General Government acting under its laws" (citations omitted)).  As a result, the Supreme Court reversed the decision of the Wisconsin Supreme Court on the grounds that "[t]he commissioner was, both by the application for the writ and the return to it, apprised that the prisoner was within the dominion and jurisdiction of another government, and that no writ of *habeas corpus* issued by him could pass over the line which divided the two sovereignties." *Tarble's Case*, 80 U.S. at 412, 20 L. Ed. at 602.

In the exercise of its constitutional power over immigration, Congress enacted the Immigration and Nationality Act.  8 U.S.C. §§ 1101–1537 (2018).  According to that congressional enactment, state officers and employees are authorized to perform the functions of a federal immigration officer pursuant to an agreement between the federal government and a state or local law enforcement agency.  *Id.* § 1357(g)(1) (stating that "the Attorney General may enter into a written agreement with a State,

or any political subdivision of a State, pursuant to which an officer or employee of the State or subdivision, who is determined by the Attorney General to be qualified to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States (including the transportation of such aliens across State lines to detention centers), may carry out such function at the expense of the State or political subdivision and to the extent consistent with State and local law"). Any such agreement shall provide that any local officer acting pursuant to such an agreement "shall have knowledge of, and adhere to, Federal law relating to the function, and shall contain a written certification that the officers or employees performing the function under the agreement have received adequate training regarding the enforcement of relevant Federal immigration laws." *Id.* § 1357(g)(2). While acting pursuant to such an agreement, the officer "shall be subject to the direction and supervision of the Attorney General." *Id.* § 1357(g)(3). The General Assembly has, in turn, determined that "any State or local law enforcement agency may authorize its law enforcement officers to also perform the functions of an officer under 8 U.S.C. Section 1357(g) if the agency has a Memorandum of Agreement or Memorandum of Understanding for that purpose with a federal agency," with "[s]tate and local law enforcement officers authorized under this provision [being] authorized to hold any office or position with the applicable federal agency required to perform the described functions." N.C.G.S. § 128-1.1(c1) (2019). As a result, local and state law enforcement officers performing

certain federal immigration functions pursuant to a 287(g) agreement between the federal government and a local law enforcement agency are acting under color of federal authority and, while acting in accordance with such an agreement, should be treated as federal, rather than state, officers. *See United States v. Sosa-Carabantes*, 561 F.3d 256, 257 (4th Cir. 2009) (stating that "[t]he 287(g) Program permits ICE to deputize local law enforcement officers to perform immigration enforcement activities pursuant to a written agreement"); *see also City of El Cenizo v. Texas*, 890 F.3d 164, 180 (5th Cir. 2018) (stating that "[u]nder these [287(g)] agreements, state and local officials become de facto immigration officers, competent to act on their own initiative").[5]

---

[5] The decision of the Court of Appeals contained a discussion of the extent to which a sheriff who had not entered into a 287(g) agreement with the federal government was entitled to detain individuals pursuant to immigration-related arrest warrants or detainers. However, the question of whether a trial court had the authority to entertain an application for the issuance of a writ of habeas corpus petition seeking the release of an individual held under immigration-related arrest warrants and detainers by sheriffs who were not parties to a 287(g) agreement was not before the Court of Appeals in this case given that former Sheriff Carmichael had entered into a 287(g) agreement and allegedly claimed to have been acting pursuant to that agreement at the time that he detained petitioners. As a result, any portion of the Court of Appeals' opinion that addresses the authority of sheriffs who had not entered into 287(g) agreements with the federal government to act on the basis of immigration-related arrest warrants and detainers constitutes mere dicta that has no binding effect in future cases. *See Hayes v. City of Wilmington*, 243 N.C. 525, 536–37, 91 S.E.2d 673, 682 (1956) (stating that statements in an opinion which are "superfluous and not needed for the full determination of the case" are dicta and "not entitled to be accounted a precedent" (citation omitted)). As a result, in the interest of clarity, we vacate those portions of the Court of Appeals' opinion that address the authority of North Carolina sheriffs who have not entered into a 287(g) agreement with the federal government to detain individuals pursuant to immigration-related arrest warrants and detainers and express no opinion concerning the extent, if any, to which an individual held in the custody of a sheriff who has not entered into a 287(g) agreement with the federal government on the basis of an immigration-related arrest

According to well-established North Carolina law, a trial judge to whom an application for the issuance of a writ of habeas corpus has been submitted has jurisdiction to determine whether it has the authority to act. *Burgess v. Gibbs*, 262 N.C. 462, 465, 137 S.E.2d 806, 808 (1964) (stating that "every court necessarily has inherent judicial power to inquire into, hear and determine the questions of its own jurisdiction, whether of law or fact, the decision of which is necessary to determine the question of its jurisdiction"). In determining whether it has the authority to proceed when asked to issue a writ of habeas corpus at the request or on behalf of a person who might conceivably be held on the basis of an immigration-related arrest warrant or detainer, the trial judge should proceed in the manner delineated by the Supreme Court in *Tarble's Case*. If, when considering an application for the issuance of a writ of habeas corpus, the trial judge determines that the application alleges that the petitioner is being held on the basis of an immigration-related arrest warrant or detainer by a custodian that is a party to a 287(g) agreement with the federal government, it must summarily deny the application for the issuance of the writ.[6] *See Tarble's Case*, 80 U.S. at 409, 20 L. Ed. at 601 (stating that, in the event that a

---

warrant or detainer is entitled to discharge in a habeas corpus proceeding conducted pursuant to North Carolina state law.

[6] To be absolutely clear, the trial judge should deny, rather than dismiss, the application given that its inability to issue the requested writ stems from the fact that the petitioner is allegedly being held pursuant to an immigration-related arrest warrant or detainer by a sheriff who is a party to a 287(g) agreement with the federal government rather than because the trial judge lacks any authority at all to entertain an application for the issuance of a writ of habeas corpus submitted by that applicant.

petition asserts that petitioners were "confined under the authority, or claim and color of the authority, of the United States, by an officer of the government[,] . . . the writ should be refused"). If, on the other hand, the trial judge determines that the application does not allege that the petitioner is being held on the basis of an immigration-related arrest warrant or detainer by a custodian operating pursuant to a 287(g) agreement, or on any other valid grounds, the trial judge has the authority to issue the writ and require the custodian to make a return. *Id.* (stating that, if the application does not disclose that the petitioner is held on the basis of federal authority, the court may "inquire into the cause of imprisonment, and ascertain by what authority the person is held within the limits of the State"). In the event that the custodian makes a return claiming that the petitioner is being held on the basis of an immigration-related arrest warrant or detainer based upon a 287(g) agreement between the custodian and the federal government, the trial judge must deny the petitioner's request for discharge.[7] *Id.* at 410, 20 L. Ed. at 601 (stating that, "after the return is made, and the State judge or court judicially apprised that the party is in custody under the authority of the United States, they can proceed no further" and must deny the writ). On the other hand, if the custodian's return shows no valid basis

---

[7] Again, for the reasons set forth in more detail above, the application for habeas corpus should be denied rather than dismissed, given that the obstacle to discharge is the applicable substantive law rather than the extent of the trial judge's jurisdiction.

for the petitioner's detention, the trial judge is required to order that the petitioner be discharged. N.C.G.S. § 17-33 (2019).

In their brief before this Court, petitioners argue that the trial court had the ability to "inquire into the legality" of petitioners' detention and "make [a] threshold factual determination" concerning the extent to which they were lawfully detained pursuant to federal authority. As we understand their argument, petitioners appear to be asserting that the trial court had the authority to determine the lawfulness of the alleged immigration-related arrest warrants or detainers upon which the Sheriff purported to be acting and to determine if the sheriff was acting in accordance with any applicable 287(g) agreement. However, *Tarble's Case* makes it clear that a state court simply has no power, in light of the preemptive effect of federal immigration laws, to look behind a sheriff's claim that the petitioner is being held pursuant to a valid immigration-related process, such as an arrest warrant or ICE detainer, by an entity operating under a 287(g) agreement with the federal government given that the Sheriff claims to be operating as a de facto immigration officer in such circumstances. For that reason, a trial judge who has been presented with an application for the issuance of a writ of habeas corpus lacks the authority to make any determination concerning the validity of any immigration-related process upon which a custodian who has entered into a 287(g) agreement with the federal government claims to be holding the petitioner, including whether the petitioner is the person named in the immigration-related process, whether the process is facially

valid, whether the personnel employed by the custodian are properly certified, or whether the process has sufficient factual support, since attempting to make such determinations would place the trial judge in the position of making decisions that have been reserved for federal, rather than state, judicial officials and potentially interfering with the manner in which federal immigration laws are administered.[8] *Nyquist v. Mauclet*, 432 U.S. 1, 10, 97 S. Ct. 2120, 2126, 53 L. Ed. 2d 63, 71 (1977) (stating that "[c]ontrol over immigration and naturalization is entrusted exclusively to the Federal Government, and a State has no power to interfere"); *Arizona*, 567 U.S. at 395, 132 S. Ct. at 2498, 183 L. Ed. 2d at 366 (stating that the federal government's "well-settled" power over immigration rests in "one national sovereign, not the 50 separate states"). As a result, in the event that a petitioner contends that he or she is being held unlawfully by a sheriff who is a party to a 287(g) agreement with the federal government on the basis of a defective immigration-related arrest warrant or detainer, his or her exclusive remedy lies with the federal, rather than the state, courts. *Tarble's Case*, 80 U.S. at 410, 20 L. Ed at 601 (stating that, if a petitioner is "within the dominion and exclusive jurisdiction of the United States. . . . [and]

---

[8] The trial judge would, of course, have the authority to inquire into the issue of whether the custodian in whose custody the petitioner is being detained has, in fact, entered into a 287(g) agreement with the federal government that is presently in effect, with the actual validity of that agreement or the manner in which it is being implemented being an issue for the federal, rather than the state, courts.

wrongly imprisoned, their judicial tribunals can release him and afford him redress").[9]

In this case, petitioners' applications for the issuance of a writ of habeas corpus clearly reflect that former Sheriff Carmichael, who had entered into a 287(g) agreement with the federal government, claimed to be detaining both petitioners on the basis of an immigration-related arrest warrant or detainer. More specifically, the applications for the issuance of a writ of habeas corpus filed by both petitioners alleged that they were being "held at the Mecklenburg County Jail pursuant to an immigration detainer and I-200 Form" and "a municipal practice of honoring civil immigration detainers" and that the Sheriff "will likely claim that his authority is derived from" a 287(g) agreement.[10] In view of the fact that the applications presented to the trial court in this case alleged that petitioners were being held on

---

[9] To repeat what has been said earlier, we reiterate that we are expressing no opinion concerning the extent, if any, to which a state or local law enforcement agency that is not a party to a 287(g) agreement with the federal government is entitled to detain a person on the basis of an immigration-related arrest warrant or detainer.

[10] The language in which the petitions are couched makes it clear that both petitioners conceded that the 287(g) agreement to which they alluded did, in fact, exist. Instead of denying that any 287(g) agreement between former Sheriff Carmichael and the federal government existed, petitioners argued that the Sheriff "must show some granting of authority from the state to allow him to enter into such an agreement" and that "[t]o allow [the Sheriff] to contract with a federal agency and expand his authority would violate the dual principles of federalism as specified in the Tenth Amendment of the U.S. Constitution." In other words, rather than denying that the Sheriff had entered into a 287(g) agreement with the federal government, petitioners asserted that the 287(g) agreement was invalid, which is an immigration-related issue that is reserved for decision by the federal, rather than the state, courts, particularly given that former Sheriff Carmichael was clearly entitled pursuant to North Carolina law to enter into the relevant agreement by N.C.G.S. § 128-1.1(c1).

the basis of an immigration-related process by a custodian that was a party to a 287(g) agreement with the federal government, the applications, on their face, informed the trial court that its state law authority to inquire into the lawfulness of petitioners' detentions had been superseded by federal law.  As a result, although the trial court did have the authority to make an initial determination concerning whether it had the authority to grant petitioners' applications, an examination of the applications themselves should have led the trial court to summarily deny petitioners' habeas corpus petitions.

Thus, for the reasons set forth above, we hold that, while a trial judge presented with an application for the issuance of a writ of habeas corpus has the authority to determine whether it is entitled to act upon any such petition, it should (1) summarily deny an application seeking the issuance of a writ of habeas corpus that alleges that the petitioner is being held pursuant to an immigration-related arrest warrant or detainer by a sheriff who is a party to a 287(g) agreement with the federal government and (2) deny a petitioner's request for discharge in the event that the return filed by a sheriff who has entered into a 287(g) agreement with the federal government claims that the petitioner is being held pursuant to an immigration-related arrest warrant or detainer.  For that reason, we further hold that the trial court erred by failing to summarily deny the applications for the issuance of a writ of

habeas corpus submitted by petitioners for its consideration in this case.[11]  On the

other hand, while the Court of Appeals correctly determined that petitioners were not

entitled to be discharged from the Sheriff's custody, it erred to the extent that (1) it

held that the trial court lacked the jurisdiction to determine whether the Sheriff, who

had clearly entered into a 287(g) agreement with the federal government, claimed to

be holding petitioners on the basis of an immigration-related arrest warrant or

detainer and (2) by addressing the extent to which habeas corpus relief is available

to petitioners who are allegedly being held on the basis of immigration-related arrest

warrants or detainers by sheriffs who are not parties to 287(g) agreements.  As a

result, the decision of the Court of Appeals is modified and affirmed, in part; reversed,

in part; and vacated, in part, with this case being remanded to the Court of Appeals

for further remand to the Superior Court, Mecklenburg County, with instructions to

deny petitioners' requests for the issuance of writs of habeas corpus and to be

discharged from custody.[12]

---

[11] In view of the fact that petitioners' applications disclosed the existence of the 287(g) agreement, petitioners' argument that the Sheriff waived the right to challenge the trial court's orders is not persuasive.

[12] At the conclusion of its opinion, the Court of Appeals ordered that "[a] certified copy of this opinion and order shall be delivered to the Judicial Standards Commission and to the Disciplinary Hearing Commission of the North Carolina State Bar." *Chavez*, 262 N.C. App. at 217, 822 S.E.2d at 145.  In a concurring opinion, Judge Dietz, who was a member of the Court of Appeals panel that decided this case, stated that the panel was "concerned that our writ of prohibition [preventing the superior court from ruling on habeas petitions] may not have been followed with respect to other undocumented immigrants involved in other habeas cases not before the Court" and that copies of its opinion had been sent to the Judicial Standards Commission and the North Carolina State Bar to make them "aware of it, should there be any allegations that this Court's writ of prohibition was ignored." *Id.* (Dietz, J.,

MODIFIED AND AFFIRMED, IN PART; REVERSED, IN PART; VACATED, IN PART; AND REMANDED.

---

concurring).  Aside from the fact that we are not inclined to assume that members of the trial bench or bar will knowingly refuse to follow orders of either this Court or the Court of Appeals, we have no hesitation in concluding that the issues before the Court of Appeals and this Court in this case were both novel and complex and that trial judges could not be expected to have predicted how either this Court or the Court of Appeals would decide how immigration-related habeas corpus petitions should be handled in advance of our decisions. As a result, we vacate those portions of the Court of Appeals' decision requiring that a copy of its opinion be delivered to the Judicial Standards Commission and the Disciplinary Hearing Commission of the North Carolina State Bar.